## VAN BROCKLIN & Another *v.* STATE OF TENNES-SEE & Others.

ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

Submitted November 17, 1885.—Decided March 1, 1886.

Property of the United States is exempt by the Constitution of the United States from taxation under the authority of a State.

Land in a State which, pursuant to acts of Congress for the laying and collecting of direct taxes, is sold, struck off and purchased by the United States for the amount of the tax thereon, and is afterwards sold by the United States for a larger sum, or redeemed by the former owner, is exempt from taxation by the State, while so owned by the United States; and, for nonpayment of taxes assessed by the State during that time, cannot be sold afterwards.

The amended bill in this case was filed in the Chancery Court of Shelby County in the State of Tennessee, by the State and its proper officers and municipalities, against Van Brocklin, Stacy and others, to enforce by sale a lien for State, county and city taxes, assessed for the years from 1864 to 1877 inclusive on lot 21 in block 6, and for the years from 1864 to 1878 inclusive on lots 13 and 14 in block 13, in Fort Pickering, a suburb of the city of Memphis.

Van Brocklin and Stacy answered that at the times of the assessments of these taxes the lands were the property of the United States, and therefore not subject to taxation under State authority.

The case was heard upon pleadings and proofs, by which it appeared to be as follows: In June, 1864, these three lots, then owned by one Glenn, with other lots, were sold by auction and struck off and conveyed to the United States, under the act of Congress of June 7, 1862, ch. 98, § 7, 12 Stat. 423, for nonpayment of direct taxes assessed thereon, with a penalty of fifty per cent. and interest. The amount so bid for lot 21 was $2.75, and the amount bid for lots 13 and 14, together with other lots not now in question, was $14. In or before 1870, Glenn conveyed the three lots to Van Brocklin, who thereupon

took possession of them, and kept possession of lot 21 ever since, and of lots 13 and 14 until March 30, 1877. The United States in 1872 brought actions of ejectment against Van Brocklin, and therein, on March 30, 1877, obtained judgments and writs of possession for the three lots, and were put in possession of lots 13 and 14. The execution of the writ of possession for lot 21 was suspended until February 3, 1878; and meanwhile, in June, 1877, this lot was redeemed by Van Brocklin in the name of Glenn from the sale for taxes, by paying $2.75, the amount of the tax, penalty and interest, and was released by the United States. In May, 1878, lots 13 and 14 were sold by the United States and bought by Stacy for the price of $54, and in July, 1878, were conveyed to him by the United States, under the acts of Congress of June 8, 1872, ch. 337, § 4, 17 Stat. 331, and February 8, 1875, ch. 36, § 26, 18 Stat. 313.

The Chancery Court held that the taxes assessed under authority of the State of Tennessee on lot 21 were valid, and that those assessed on lots 13 and 14 were invalid, and entered a decree accordingly. Both parties appealed to the Supreme Court of Tennessee, which held that all the taxes assessed under the authority of the State were valid, and entered a decree for the sale of the three lots to pay them. Thereupon Van Brocklin and Stacy sued out this writ of error.

The provisions of the Constitution and laws of Tennessee, referred to in the opinion of that court, and in force at the time of the assessment of these taxes, were as follows: By the Constitution of 1870, art. 2, § 28, "All property, real, personal, or mixed, shall be taxed; but the legislature may except such as may be held by the State, by counties, cities or towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational; and shall except one thousand dollars' worth of personal property in the hands of each taxpayer, and the direct products of the soil in the hands of the producer and his immediate vendee." By the statutes of 1866–67, ch. 40, and 1867–68, ch. 28, lands of which the exclusive jurisdiction is ceded by the State to the United States for cemeteries, or for public buildings, shall be "exonerated and free from any

taxation or assessment, under the authority of this State, or of any municipality therein," while so used. Compiled Laws of 1871, pp. 92, 245 & seq. The statute of 1875, ch. 108, entitled, " An act to define what property is by the Constitution exempt from taxation, and what the legislature under the power conferred upon it does exempt, and what is taxable," enacts that " all property, real, personal, and mixed, shall be assessed and taxed," with certain exceptions, among which are the following: "All property belonging to the United States, or the State of Tennessee." "All property belonging to any county, city or town, and used exclusively for public or corporation purposes." Acts of 1875, p. 177.

*Mr. George Gillham* and *Mr. W. K. Poston* for plaintiffs in error.

*Mr. J. B. H ˈskell* and *Mr. Lee Thornton* for defendants in error.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

The question presented by this writ of error is whether lands in the State of Tennessee, which, pursuant to acts of Congress for the laying and collecting of direct taxes, are sold, struck off and purchased by the United States for the amount of the tax thereon, and are afterwards sold by the United States for a larger sum, or redeemed by the former owner, are liable to be taxed, under authority of the State, while so owned by the United States.

The judgment of the Supreme Court of Tennessee rests upon the position that these lands, although lawfully purchased by the United States, and owned by the United States at the time of being taxed under the laws of the State, were not exempt from State taxation, because they had not been expressly ceded by the State to the United States.

We are unable to reconcile this position with a just view of the rights and powers conferred upon the national government by the Constitution of the United States. The importance of

the subject, and the consideration due to the opinion of that learned court, make it proper to state somewhat fully the grounds of our conclusion.

In the words of Chief Justice Marshall, "The United States is a government, and consequently a body politic and corporate, capable of attaining the objects for which it was created, by the means which are necessary for their attainment. This great corporation was ordained and established by the American people, and endowed by them with great powers for important purposes. Its powers are unquestionably limited; but while within those limits, it is a perfect government as any other, having all the faculties and properties belonging to a government, with a perfect right to use them freely, in order to accomplish the objects of its institution." *United States* v. *Maurice*, 2 Brock. 96, 109. The United States, for instance, as incident to the general right of sovereignty, have the capacity, within the sphere of their constitutional powers, and through the instrumentality of the proper department, to enter into contracts and take bonds, not prohibited by law, and appropriate to the just exercise of those powers, although not expressly directed or authorized to do so by any legislative act; and likewise to take mortgages of real estate to secure the payment of debts due to them, notwithstanding Congress has enacted that "no land shall be purchased on account of the United States, except under a law authorizing such purchase." Act of May 1, 1820, ch. 52, § 7, 3 Stat. 568; Rev. Stat. § 3736; *Neilson* v. *Lagow*, 12 How. 98, 107, 108, and cases there cited. So the United States, at the discretion of Congress, may acquire and hold real property in any State, whenever such property is needed for the use of the government in the execution of any of its powers, whether for arsenals, fortifications, light-houses, custom-houses, court-houses, barracks or hospitals, or for any other of the many public purposes for which such property is used; and when the property cannot be acquired by voluntary arrangement with the owners, it may be taken against their will, by the United States, in the exercise of the power of eminent domain, upon making just compensation, with or without a concurrent act of the State in which the land

is situated. *Harris* v. *Elliott*, 10 Pet. 25 ; *Kohl* v. *United States*, 91 U. S. 367; *United States* v. *Fox*, 94 U. S. 315, 320 ; *United States* v. *Jones*, 109 U. S. 513 ; *United States* v. *Great Falls Manufacturing Co.*, 112 U. S. 645 ; *Fort Leavenworth Railroad* v. *Lowe*, 114 U. S. 525, 531, 532.

While the power of taxation is one of vital importance, retained by the States, not abridged by the grant of a similar power to the government of the Union, but to be concurrently exercised by the two governments, yet even this power of a State is subordinate to, and may be controlled by, the Constitution of the United States. That Constitution and the laws made in pursuance thereof are supreme ; they control the constitutions and laws of the respective States, and cannot be controlled by them. The people of a State give to their government a right of taxing themselves and their property at its discretion. But the means employed by the government of the Union are not given by the people of a particular State, but by the people of all the States ; and being given by all, for the benefit of all, should be subjected to that government only which belongs to all. All subjects over which the sovereign power of a State extends are objects of taxation ; but those over which it does not extend are, upon the soundest principles, exempt from taxation. The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission ; but does not extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States. The attempt to use the taxing power of a State on the means employed by the government of the Union, in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give. The power to tax involves the power to destroy ; the power to destroy may defeat and render useless the power to create ; and there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control. The States have no power, by taxation

or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.

Such are the outlines, mostly in his own words, of the grounds of the judgment delivered by Chief Justice Marshall in the great case of *McCulloch* v. *Maryland*, in which it was decided that a statute of the State of Maryland, imposing a tax upon the issue of bills by banks, could not constitutionally be applied to a branch of the Bank of the United States within that State. 4 Wheat. 316, 425–431, 436.

In *Osborn* v. *Bank of United States*, 9 Wheat. 738, 859–868, that conclusion was reviewed in a very able argument of counsel, and reaffirmed by the court, and a tax laid by the State of Ohio upon a branch of the Bank of the United States was held to be unconstitutional. See also *Providence Bank* v. *Billings*, 4 Pet. 514, 564. Upon the same grounds, the States have been adjudged to have no power to lay a tax upon stock issued for money borrowed by the United States, or upon property of State banks invested in United States stock. *Weston* v. *City Council of Charleston*, 2 Pet. 449, 467; *Bank of Commerce* v. *New York*, 2 Black, 620; *Bank Tax Case*, 2 Wall. 200; *Banks* v. *Mayor*, 7 Wall. 16.

To guard against any misunderstanding of the scope and effect of the decision in *McCulloch* v. *Maryland*, Chief Justice Marshall added: "This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State." 4 Wheat. 436. And in *Osborn* v. *Bank of United States*, speaking of contractors with the United States, he said: "It is true, that the property of the contractor may be taxed, as the property of other citizens; and so may the local property of the bank." 9 Wheat. 867.

But the only taxes thus spoken of as valid are those upon

property not owned by the United States, but either real estate owned by the bank, or bank stock or other property owned by individuals. Throughout the discussion, both by the counsel and by the court, in *McCulloch* v. *Maryland,* State taxes upon any property of the United States had been treated as not distinguishable in principle from the particular tax whose validity was in controversy. This will be clearly shown by referring to a few passages of the arguments and the opinion.

Not only did each of the counsel for the State of Maryland, Mr. Hopkinson, Mr. Jones, and Mr. Martin, make it a cornerstone of his argument in support of the validity of the tax on the bank, that the property of the United States as such was not exempt from taxation by the State in which it was situated. 4 Wheat. 343, 369, 375. But the opposing counsel frankly accepted the issue.

Mr. Webster, in opening the argument against the validity of the tax, said : " The government of the United States has itself a great pecuniary interest in this corporation. Can the States tax this property ? Under the Confederation, when the national government, not having the power of direct legislation, could not protect its own property by its own laws, it was expressly stipulated, that ' no impositions, duties or restrictions should be laid by any State on the property of the United States.' Is it supposed that property of the United States is now subject to the power of the State governments in a greater, degree than under the Confederation ? If this power of taxation be admitted, what is to be its limit ? The United States have, and must have, property locally existing in all the States ; and may the States impose on this property, whether real or personal, such taxes as they please ? " 4 Wheat. 328.

Mr. Pinkney, in the closing argument on the same side, said : " There is no express provision in the Constitution, which exempts any of the national institutions or property from State taxation. It is only by implication that the army, and navy, and treasure, and judicature of the Union are exempt from State taxation. Yet they are practically exempt ; and they must be, or it would be in the power of any one State to destroy their use. Whatever the United States have a right to

do, the individual States have no right to undo." 4 Wheat. 390, 391. "All the property and all the institutions of the United States are, constructively, without the local, territorial jurisdiction of the individual States, in every respect, and for every purpose, including that of taxation." 4 Wheat. 395.

Chief Justice Marshall, in delivering judgment, covered the whole ground by saying: "If the States may tax one instrument, employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent rights; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government, to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the States.

"Gentlemen say, they do not claim the right to extend State taxation to these objects. They limit their pretensions to property. But on what principle is this distinction made? Those who make it have furnished no reason for it, and the principle for which they contend denies it." 4 Wheat. 432.

So in *Weston* v. *City Council of Charleston,* the exemption of the public lands, while owned by the United States, from State taxation was assumed; both in the argument of counsel that a State tax on stock issued by the United States to individuals was equally valid with a tax on lands after they had been sold by the United States to private persons; and in the answer made by Chief Justice Marshall: "The distinction is, we think, apparent. When lands are sold, no connection remains between the purchaser and the government. The lands purchased become a part of the mass of property in the country, with no exemption from common burthens." 2 Pet. 459, 468.

The United States do not and cannot hold property, as a monarch may, for private or personal purposes. All the property and revenues of the United States must be held and applied, as all taxes, duties, imposts and excises must be laid and collected, "to pay the debts and provide for the common

defence and general welfare of the United States." Constitution, art. 1, sect. 8, cl. 1; *Dobbins* v. *Erie County Commissioners*, 16 Pet. 435, 448. The principal reason assigned in *Buchanan* v. *Alexander*, 4 How. 20, for holding that money in the hands of a purser, due to seamen in the navy for wages, could not be attached by their creditors in a State court, was, " The funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by State process or otherwise, the functions of the government may be suspended."

The more thoroughly the proceedings by which the States became members of the Union, either by joining in establishing the Federal Constitution, or by admission under subsequent acts of Congress, are examined, the more strongly they confirm the same view.

In the Articles of Confederation of 1778, it had been expressly stipulated that "no imposition, duties or restriction shall be laid by any State on the property of the United States." And in the articles which the Ordinance of 1787 for the government of the Northwest Territory declared should " be considered as articles of compact between the original States and the people and States in said Territory, and forever remain unalterable, unless by common consent," it had been provided that " no tax shall be imposed on lands the property of the United States." Constitutions and Charters, 8, 432.

The Articles of Confederation ceased to exist upon the adoption of the Federal Constitution; and the Ordinance of 1787, like all acts of Congress for the government of the Territories, had no force in any State after its admission into the Union under that Constitution. *Permoli* v. *First Municipality of New Orleans*, 3 How. 589, 610; *Strader* v. *Graham*, 10 How. 82.

The Constitution creating a more perfect union, and increasing the powers of the national government, expressly authorized the Congress of the United States "to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States;" "to exercise exclusive legislation over all places pur-

chased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings;" and "to dispose of and make needful rules and regulations respecting the 'territory or other property belonging to the United States;" and declared, "This Constitution and the laws of the United States which shall be made in pursuance thereof shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding." No further provision was necessary to secure the lands or other property of the United States from taxation by the States.

Nor was any provision on this subject inserted in the acts of Congress for the admission into the Union of Vermont in 1791; of Kentucky, formed out of part of Virginia, in the same year; of Tennessee, formed out of part of North Carolina, in 1796; of Maine, formed out of part of Massachusetts, in 1820; of Texas, previously a foreign and independent republic, in 1845; or of West Virginia, formed out of part of Virginia, in 1862. Constitutions and Charters, 1875, 646, 1676, 810, 1764, 1992.

The first State formed out of territory not within the jurisdiction of an existing State was Ohio, admitted into the Union in 1802, under an act of Congress containing three propositions, offered by Congress for her acceptance or rejection, and which were accepted by the State, namely, that one section of land should be granted to each township for the use of schools, that certain salt springs should be granted to the State, and that one twentieth part of the net proceeds of lands lying within the State and sold by Congress after June 30, 1802, should be applied to the laying out of public roads: "Provided always, that the three foregoing propositions herein offered are on the conditions that the convention of the said State shall provide, by an ordinance irrevocable without the consent of the United States, that every and each tract of land sold by Congress from and after the thirtieth day of June next shall be and remain exempt from any tax laid by order or under authority of the State, whether for State, county, township, or any other purpose whatever, for the

term of five years from and after the day of sale." Constitutions and Charters, 1454, 1455.

The acts for the admission of Indiana in 1816, and Illinois in 1818, contained similar provisions to those in the act for the admission of Ohio. Constitutions and Charters, 499, 438.

Neither of these three acts contained any stipulation for the exemption of the lands of the United States from State taxation; but each, assuming that exemption as undoubted, and requiring no affirmance, so long as the United States owned the lands, only provided for its continuance for five years after the United States should have sold them, and thereby ceased to have any interest in them.

The statement of Mr. Justice McLean, in a case in the Circuit Court concerning land in Illinois, " In the admission of new States into the Union, compacts were entered into with the Federal Government, that they would not tax the lands of the United States," was therefore, as applied to the case before him, an inadvertence, which impairs the weight of his dictum, based upon it, that " this implies that the States had power to tax such land, if unrestrained by compact." *United States* v. *Railroad Bridge Co.*, 6 McLean, 517, 531–533.

The question in issue in that case was not of the State's right of taxation, but of its right of eminent domain for the construction of roads and bridges. The decision of the learned justice in favor of the validity of the exercise of that right by a State over lands of the United States, without the consent of the United States, manifested either by an express act of Congress, or by the assent of a department or officer vested by law with the power of disposing of lands of the United States, appears to have been based upon the theory that the United States can hold land as a private proprietor, for other than public objects, and upon a presumption of the acquiescence of Congress in the State's exercise of the power as tending to increase the value of the lands ; and it finds some support in dicta of Mr. Justice Woodbury, in a case in which, however, the exercise of the power by the State was adjudged to be unlawful. *United States* v. *Chicago*, 7 How. 185, 191, 195. But it can hardly be reconciled with the views expressed by Congress, in acts con-

cerning particular railroads, too numerous to be cited, as well
as in general legislation. Acts of August 4, 1852, ch. 80, and
March 3, 1855, ch. 200, 10 Stat. 28, 683; July 26, 1866, ch.
262, § 8, 14 Stat. 253; Rev. Stat. § 2477. When that question
shall be brought into judgment here, it will require and will
receive the careful consideration of the court.

Upon the question of taxation of lands of the United States
by the State of Illinois, two well considered opinions of the
Supreme Court of that State are worthy of reference in this
connection. In one of them, it was held that a lot of land in
Chicago, owned by the United States, used by them for a cus-
tom-house, post-office and court-house, and which the legisla-
ture of the State had consented might be so used, and had ceded
jurisdiction over, was not liable to assessment by the municipal
authorities, under a statute of the State, for the amount of the
benefit to the land from the laying out of a highway ; and the
court said : " Nor under our system of government can the
States tax the general government, its agents or property, nor
can the general government tax the States, their agents or
property." " A municipal corporation has no power to assess
or exact from the State or the general government any sum
for benefits conferred. The power to levy taxes or impose as-
sessments for benefits can only be exercised on the governed,
and not on the governing power, whether State or Federal."
*Fagan* v. *Chicago,* 84 Illinois, 227, 233, 234. In the other case,
it was directly adjudged that from the very nature of the rela-
tion between the Federal and State governments, and without
regard to any supposed compact contained in the Ordinance of
1787, or in any act of Congress, no property lawfully vested in
the United States could be taxed by the State, and that there-
fore land sold, purchased and held by the United States for
nonpayment of direct taxes was exempt from State taxation.
*People* v. *United States,* 93 Illinois, 30.

In Louisiana, the first territory acquired by the United States
from a foreign country, the act of March 26, 1804, establishing
a territorial government over it by the name of the Territory
of Orleans, provided that the legislative power should be vested
in the governor and legislative council, and " shall extend to

all the rightful subjects of legislation; but no law shall be valid which is inconsistent with the Constitution and laws of the United States;" and that "the governor or legislative council shall have no power over the primary disposal of the soil, nor to tax the lands of the United States." Constitutions and Charters, 691.

On April 28, 1806, John Breckenridge, of Kentucky, Attorney General of the United States, gave to Mr. Madison, Secretary of State, a brief and comprehensive opinion, not based upon the restrictions imposed by the territorial act on the legislative council, or upon any considerations peculiar to Louisiana, but upon general principles applicable to all the States and Territories alike, and therefore, and as the earliest legal opinion upon the question, worthy of being quoted in full. It is in these words: "I am of opinion that there rests no power in the city council, nor in any department of the government of Orleans, to tax the property of the United States within that Territory. I believe the exercise of such power has never been before attempted in any part of the United States, and I think the general government ought not to admit the principle. Laying the tax will be harmless, for I see no means by which the payment of it can be enforced." 1 Opinions of Attorneys General, 157.

By the conditions of the acts of 1811 and 1812 under which the State of Louisiana was admitted into the Union, "the people inhabiting the said Territory do agree and declare that they forever disclaim all right or title to the waste or unappropriated lands lying within the said Territory, and that the same shall be and remain at the sole and entire disposition of the United States, and moreover that each and every tract of land sold by Congress shall be and remain exempt from any tax laid by the order or under the authority of the State, whether for State, county, township, parish, or any other purpose whatever, for the term of five years from and after the respective days of the sales thereof," " and that no taxes shall be imposed on lands the property of the United States." Constitutions and Charters, 699, 700, 710.

Upon the admission of every other State into the Union, the

exemption of the lands of the United States from taxation by
the State has been declared—sometimes in the form of a con-
dition imposed by Congress, and sometimes in the form of a
proviso to a proposition to grant the State certain lands
or money, offered for its acceptance or rejection—in phrases
somewhat varying, but substantially similar to one another.

In the acts for the admission of Mississippi in 1817, Alabama
in 1819, Missouri in 1820, Arkansas in 1836, Michigan in 1837,
Iowa in 1845 and 1846, Wisconsin in 1847, Minnesota in 1857,
and Oregon in 1859, the words are " no tax shall be imposed on
lands the property of the United States," or words of exactly
the same meaning.  Constitutions and Charters, 1053, 31, 1103;
118, 995, 535, 552, 2027, 1028, 1508.  In the acts of 1864 for
the admission of Nevada, of 1864 and 1867 for the admission
of Nebraska, and of 1875 for the admission of Colorado, the
expression is somewhat fuller, " no tax shall be imposed by
the State on lands or property therein, belonging to, or which
may hereafter be purchased by, the United States."  Ib. 1246,
1202, 1213, 218.

Florida was admitted in 1845, upon the express condition
that it should never interfere with the primary disposal of the
public lands lying within it, " nor levy any tax on the same
whilst remaining the property of the United States; " and Cali-
fornia in 1850, " upon the express condition that the people of
said State, through their legislature or otherwise, shall never
interfere with the primary disposal of the public lands within
its limits, and shall pass no law and do no act whereby the title
of the United States to, and right to dispose of, the same shall
be impaired or questioned; and that they shall never lay any
tax or assessment of any description whatsoever upon the pub-
lic domain of the United States."  Constitutions and Charters,
332, 208.

In the debate in the Senate in June, 1850, on the act for the
admission of California, a motion to amend the act by requiring
California before her admission to pass in convention an ordi-
nance providing, among other things, " that she relinquishes all
title or claim to tax, dispose of, or in any way to interfere with
the primary disposal by the United States of the public domain

within her limits," was opposed by Mr. Douglas and Mr. Webster as unnecessary, and was defeated by a vote of thirty-six to nineteen. In the course of the debate, Mr. Douglas, after showing that the United States acquired title to the public lands, not by virtue of their sovereignty, but by deeds of cession from the old States, or by treaty of cession from France, Spain or Mexico, and referring to the provision of the Constitution authorizing Congress " to dispose of and make all needful rules and regulations concerning the territory or other property of the United States," said : " This provision authorizes the United States to be and become a land owner, and prescribes the mode in which the lands may be disposed of and the title conveyed to the purchaser. Congress is to make the needful rules and regulations upon this subject. The title of the United States can be divested by no other power, by no other means, in no other mode, than that which Congress shall sanction and prescribe. It cannot be done by the action of the people or legislature of a Territory or State." And he supported this conclusion by a review of all the acts of Congress under which States had theretofore been admitted. Mr. Webster said that those precedents demonstrated that " the general idea has been, in the creation of a State, that its admission as a State has no effect at all on the property of the United States lying within its limits ; " and that it was settled by the judgment of this court in *Pollard* v. *Hagan*, 3 How. 212, 224, " that the authority of the United States does so far extend as, by force of itself, *proprio vigore*, to exempt the public lands from taxation, when new States are created in the Territory in which the lands lie." Congressional Globe, 31st Cong., 1st sess., vol. 21, p. 1314, vol. 22, pp. 848 *& seq.*, 960, 989, 1004 ; 5 Webster's Works, 395, 396, 405.

The Supreme Court of the State of California appears at one period to have assumed that the exemption of the lands of the United States from taxation depended upon the terms of the act of Congress admitting the State into the Union, or upon the statutes of the State. *People* v. *Morrison*, 22 California, 73 ; *People* v. *Shearer*, 30 California, 645. But in later cases it has taken broader ground, and has defined the meaning of

"taxation" as "a charge levied by the sovereign power upon the property of its subject. It is not a charge upon its own property, nor upon property over which it has no dominion. This excludes the property of the State, whether lands, revenues or other property, and the property of the United States." *People* v. *McCreery*, 34 California, 432, 456; *People* v. *Austin*, 47 California, 353, 361.

The recital, in the ordinance prefixed to the Constitution of Kansas, that the State would possess the right to tax the lands owned by the United States within its limits, and the conditional relinquishment of that right, were not assented to by Congress; and Kansas was admitted into the Union in 1861, only upon the passage by its legislature of another ordinance, irrevocable without the consent of Congress, accepting certain propositions, in which it was provided that the State should never interfere with the primary disposal of the soil within the same by the United States, and should never tax the lands of the United States. Constitutions and Charters, 613; Act of Congress of January 29, 1861, ch. 20, § 3, 12 Stat. 127; Joint Resolution of Legislature of Kansas of January 20, 1862, Compiled Laws of Kansas, 1862, p. 84. In 1865 the Supreme Court of the State, discussing and upholding the validity of a State tax upon Indian lands, said: "If the title to the lands be in the United States, they are not taxable. Not only are the lands of the general government exempt from taxation by express stipulation on the part of the State, but without such agreement they would not be liable to be taxed. The irrevocable ordinance of the legislature is merely the expression of what the law would have been without it." *Blue Jacket* v. *Johnson County Commissioners*, 3 Kansas, 299, 348, reversed by this court in 5 Wall. 737, only because even the Indian lands were exempt from taxation. See also *Parker* v. *Winsor*, 5 Kansas, 362, 367, 372. The statutes of the State of Kansas, ever since its admission into the Union, have enumerated, among the property exempt from taxation, all property, real and personal, of the United States. Compiled Laws 1862, ch. 198, § 2; Gen. Stat. 1868, ch. 107, § 3; Stat. 1876, ch. 34, § 3.

The taxation by the State of Kansas, the validity of which

was upheld by the decision of the Supreme Court of that State in *Fort Leavenworth Railroad* v. *Lowe*, 27 Kansas, 749, affirmed by this court in 114 U. S. 525, was not upon property of the United States, but upon property of a railroad corporation in lands situated within the boundaries of the Fort Leavenworth Military Reservation, yet not in that part of the lands occupied or used by the United States for a fort or military post. The civil and criminal jurisdiction over the Reservation had passed to the State upon its admission into the Union, and the cession of exclusive jurisdiction by the subsequent statute of Kansas of 1875, ch. 66, which, because it conferred a benefit, was presumed to have been accepted by the United States, expressly saved " to said State the right to tax railroad, bridge and other corporations, their franchises and property, on said Reservation."

It cannot be doubted that the provisions which speak the exemption of property of the United States from taxation, in the various acts of Congress admitting States into the Union, are equivalent to each other; and that, like the other provision, which often accompanies them, that the State " shall not interfere with the primary disposal of the soil by the United States," they are but declaratory, and confer no new right or power upon the United States.

In *Gibson* v. *Chouteau*, 13 Wall. 92, 99, Mr. Justice Field, delivering the judgment of this court, said : " With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made. No State legislature can interfere with this right or embarrass its exercise ; and to prevent the possibility of any attempted interference with it, a provision has been usually inserted in the compacts by which new States have been admitted into the Union, that such interference with the primary disposal of the soil of the United States shall never be made."

Upon the admission of a State into the Union, the State

doubtless acquires general jurisdiction, civil and criminal, for the preservation of public order, and the protection of persons and property, throughout its limits, except where it has ceded exclusive jurisdiction to the United States. The rights of local sovereignty, including the title in lands held in trust for municipal uses, and in the shores of navigable waters below high water mark, vest in the State, and not in the United States. *New Orleans* v. *United States*, 10 How. 662, 737; *Pollard* v. *Hagan*, 3 How. 212; *Goodtitle* v. *Kibbe*, 9 How. 471; *Doe* v. *Beebe*, 13 How. 25; *Barney* v. *Keokuk*, 94 U. S. 324. But public and unoccupied lands, to which the United States have acquired title, either by deeds of cession from other States, or by treaty with a foreign country, Congress, under the power conferred upon it by the Constitution, "to dispose of and make all needful rules and regulations respecting the territory or other property of the United States," has the exclusive right to control and dispose of, as it has with regard to other property of the United States; and no State can interfere with this right, or embarrass its exercise. *United States* v. *Gratiot*, 14 Pet. 526; *Pollard* v. *Hagan*, 3 How. 212; *Irvine* v. *Marshall*, 20 How. 558, 563; *Gibson* v. *Chouteau*, above cited.

In *McGoon* v. *Scales*, 9 Wall. 23, part of the public lands in Wisconsin being claimed under a sale for State taxes, this court, speaking by Mr. Justice Miller, said: "The answer to this is, that the land was then owned by the United States, and was not subject to State taxation." 9 Wall. 27. No reference was made to any act of Congress, or compact with the State; but the fact that the land was then owned by the United States was given as the only and conclusive reason why it could not be taxed by the State. So in *Tucker* v. *Ferguson*, 22 Wall. 527, in which it was decided that public lands in Michigan, granted by act of Congress to the State, to be held by the State to aid in the construction of a railroad, could not be taxed by the State, Mr. Justice Swayne, delivering judgment, said: "Upon general principles, she could not tax the lands while the title remained in the United States, nor while she held them as the trustee of the United States,

which, in the view of the law, was the same thing." 22 Wall. 572.

The cases in which it has been held that public lands, granted by the United States to a railroad company, continue to be exempt from State taxation so long as the costs of survey have not been paid and patents have not been issued, stand upon equally broad ground. *Railway Co.* v. *Prescott*, 16 Wall. 603, 608; *Railway Co.* v. *McShane*, 22. Wall. 444, 462; *Northern Pacific Railroad* v. *Traill County*, 115 U. S. 600, 610. And the reason why, after lands have been duly entered at the land office, and everything has been done to entitle the party to a patent, they have by long usage, confirmed by the decisions of this court, been considered, before the patent is actually taken out, as subject to State taxation, is that the United States have nothing but the naked legal title, and the lands are in truth no longer public property, but have become private property. *Carroll* v. *Safford*, 3 How. 441; *Witherspoon* v. *Duncan*, 4 Wall. 210; *Deffeback* v. *Hawke*, 115 U. S. 392, 405.

Even in the courts of the several States, the decided and increasing preponderance of authority is in favor of the absolute exemption of all property of the United States from State taxation.

The only instances that have been brought to our notice, in which a State court has countenanced the right of a State to tax any property of the United States, are the judgment now under review; some remarks in *Louisville* v. *Commonwealth*, 1 Duvall, 295, in which the only matter in issue was a tax laid by the State of Kentucky on property of one of its own municipal corporations; a dictum in *People* v. *Shearer*, 30 California, 645, 658; and two cases in the Supreme Court of Pennsylvania, not found in the regular series of its reports, but only in law periodicals, and in a reprint of one of them in a collection of *nisi prius* and other cases. *Commonwealth* v. *Young*, 1 Hall's Journal of Jurisprudence, 47; *S. C.*, Brightly, 302; *Roach* v. *Philadelphia County*, 2 Am. Law Journal (N. S.), 444.

In *Commonwealth* v. *Young*, decided in 1818, a person employed by the President of the United States, with the author-

ity of Congress, to sell by public auction land in Pittsburgh, owned by the United States, was indicted and fined for so selling it, because he had not been licensed as an auctioneer under the statutes of the State. It was found by special verdict that the title to the land under the late proprietary of Pennsylvania was vested in fee simple in the United States; that the United States had erected a fort thereon, which had been used as a barrack, military depot, and place of defence, but had been disused as such a short time before the sale; and that the State had never ceded its jurisdiction over it to the Federal government. By the act of Congress of August 2, 1813, ch. 48, the President had been authorized to cause this land to be sold, and the proceeds of the sale were "appropriated, under the direction of the President, to the erection of arsenals, armories and laboratories." 3 Stat. 75. The ground of the decision, as assigned by the court, was that the United States held this lot as an individual, and therefore "the lot was subject to taxation for State purposes, to the laws directing the mode of alienation, and, in short, every other State regulation that could operate on the property of an individual." 1 Hall's Journal of Jurisprudence, 50; Brightly, 306. Of that decision it is perhaps enough to say that, even if the manner of transferring the property might lawfully be regulated by the State, it does not appear to us to follow that the State might take it by taxation; the decision was made before the judgment of this court in *McCulloch* v. *Maryland;* and the subsequent judgment of the Supreme Court of Pennsylvania in *Commissioners* v. *Dobbins*, 7 Watts, 513, sustaining the validity of a county tax upon the salary of an officer of the United States, was reversed by this court. *Dobbins* v. *Erie County Commissioners*, 16 Pet. 435.

In *Roach* v. *Philadelphia County*, above cited, a tax on the United States mint was held valid, but no opinion is reported.

On the other hand, the necessary exemption of all the property of the United States from State taxation has been recognized by the highest courts of Illinois, California and Kansas, in the cases already cited; and by those of Virginia, Connecticut, Iowa and Wisconsin. *Western Union Telegraph Co.* v.

*Richmond*, 26 Grattan, 1, 30; *Andrew* v. *Auditor*, 28 Grattan, 115, 124; *West Hartford* v. *Water Commissioners*, 44 Conn. 360, 368; *Chicago, Rock Island & Pacific Railroad* v. *Davenport*, 51 Iowa, 451, 454; *Wisconsin Central Railroad* v. *Taylor County*, 52 Wisconsin, 37, 51, 52.

The legislatures of most of the States have affirmed the same principle, by inserting in their general tax acts an exemption of property belonging to the United States.    Such a provision, as has been well observed by the Supreme Court of Connecticut in *West Hartford* v. *Water Commissioners*, above cited, is not the foundation of the exemption, but is inserted only from abundant caution, and because the assessment of taxes is to be made by local officers skilled in the valuation of property, but presumably unlearned in legal distinctions.    44 Conn. 368.

An examination of the existing statutes of the several States (cited in the margin *) shows this result: In at least twenty-

---

*The express exemption of property of the United States in the general tax acts of each State is as follows :

ALABAMA.  " All property belonging to the United States."  Code 1876, § 358.

ARKANSAS.  " All property, whether real or personal, belonging exclusively to the United States."  Digest 1874, § 5055.

CALIFORNIA.  " The property of the United States."  Political Code 1872, § 3607.

COLORADO.  None.  Gen. Stat. 1883, § 2815.

CONNECTICUT.  " All property belonging to the United States."  Gen. Stat. 1875; tit. 12, ch. 1, § 12.

DELAWARE.  " Property belonging to the United States."  Rev. Stat. 1874, ch. 11, § 1.

FLORIDA.  "All property, real and personal, of the United States."  Digest 1872, ch. 138, § 4.

GEORGIA.  "All property specially exempted by the Constitution of the United States."  "All lands, mines and minerals belonging to the United States."  Code 1873, § 798.  "All public property."  Code 1882, § 798.

ILLINOIS.  " All unentered government lands, all public buildings or structures of whatever kind, and the contents thereof, and the land on which the same are located, belonging to the United States."  Rev. Stat. 1880, ch. 120, § 2.

INDIANA.  "The property of the United States."  Rev. Stat. 1881, § 6276.

IOWA.  " The property of the United States."  Code 1873, § 797.

KANSAS.  "All property belonging exclusively to the United States."  Stat. 1876, ch. 34, § 3.

KENTUCKY.  " The property of the United States, used for custom-houses, post-offices, docks, ship-yards, forts, arsenals or barracks."  Gen. Stat. 1883, ch. 92, art. 1, § 3.

six States, namely, Massachusetts; Connecticut, New Jersey, Delaware, Maryland, South Carolina, Vermont, Maine, Ohio, Indiana, Michigan, Wisconsin, Iowa, Kansas, Nebraska, Minnesota, Alabama, Mississippi, Louisiana, Arkansas, Texas, Florida, West Virginia, California, Oregon and Nevada, all property of the United States is expressly exempted from taxation. In Rhode Island, New York, Illinois and Missouri, " all

LOUISIANA. "All lands and lots of ground, with their buildings, improvements and structures thereon, and all other property, belonging to the United States. Rev. Stat. 1870, § 3233.

MAINE. " The property of the United States." Rev. Stat. 1883, ch. 6, § 6.

MARYLAND. " Property belonging to the United States." Rev. Code 1878, art. 11, § 3.

MASSACHUSETTS. " The property of the United States." Pub. Stat. 1882, ch. 11, § 5.

MICHIGAN. "All the property of the United States." Compiled Laws 1871, ch. 21, § 5.

MINNESOTA. " All property, whether real or personal, belonging exclusively to the United States." Stat. 1878, ch. 11, § 5.

MISSISSIPPI. " All property, real or personal, belonging to the United States." Rev. Code 1871, § 1662.

MISSOURI. "Lands and lots, public buildings and structures, with their furniture and equipments belonging to the United States." Rev. Stat. 1879, § 6659.

NEBRASKA. " The property of the United States." Gen. Stat.1873, ch. 66, § 1.

NEVADA. " All lands or other property of the United States." Compiled Laws 1873, ch. 98, § 4.

NEW HAMPSHIRE. " The lots of land selected and purchased in this State by the United States for the purpose of erecting light-houses and other public buildings, with the buildings thereon." Gen. Laws 1878, ch. 53, § 2.

NEW JERSEY. " The property and the bonds and other securities of the United States." Rev. Stat. 1877, p. 1151, § 5.

NEW YORK. " 1. All property, real or personal, exempted from taxation by the Constitution of this State, or under the Constitution of the United States. 2. All lands belonging to this State, or the United States." Rev. Stat. 1846, pt. 1, ch. 13, tit. 1, § 4.

NORTH CAROLINA. Parcels of land, containing not more than twenty acres each, purchased by the United States from any individual or corporation, and held " for the purpose of erecting thereon light-houses, light-keeper's dwellings, life-saving stations, buoys and coal depots, and buildings connected therewith." Code 1883, §§ 3080; 3082.

OHIO. " All property, whether real or personal, belonging exclusively to the United States." Rev. Stat. 1880, § 2732.

OREGON. " All property, real and personal, of the United States." General Laws 1874, ch. 57, § 4.

lands belonging to the United States " are exempted; and in New York also " all property, real or personal, exempted from taxation under the Constitution of the United States." In Georgia, the phrase is " all public property;" and in Tennessee, " all property belonging to the United States, used exclusively for public purposes." In New Hampshire, North Carolina and Kentucky, the exemption is of certain public buildings and the lands on which they stand. In three States only, namely, Pennsylvania, Virginia and Colorado, is no exemption of property of the United States expressly declared. But it may be remembered that the act of Congress for the admission of Colorado provided in the most sweeping terms that the State should impose no tax on lands or property then belonging to, or thereafter purchased by, the United States. Constitutions and Charters, 1246. And no State court has more strongly stated the absolute exemption of property of the United States from State taxation than the Court of Appeals of Virginia has in a recent case, saying : "It is very clear that the States are prohibited from taxing either the property of the Federal government or the instrumentalities by which its powers are carried into execution. This doctrine is well settled." *Western Union Telegraph Co.* v. *Richmond,* above cited.

General tax acts of a State are never, without the clearest words, held to include its own property, or that of its munici-

---

PENNSYLVANIA. None. Stats. 1873, ch. 41 ; 1874, ch. 94.

RHODE ISLAND. "Lands ceded or belonging to the United States." Pub. Stat. 1882, ch. 41, § 2.

SOUTH CAROLINA. " All property owned exclusively by the United States." Rev. Stat. 1882, § 169.

TENNESSEE. " All property belonging to the United States, used exclusively for public purposes." Stat. 1883, ch. 105, § 2 ; Code 1884, § 601.

TEXAS. " All property, whether real or personal, belonging exclusively to the United States." Rev. Stat. 1879, art. 4673.

VERMONT. " Real and personal estate owned by the United States." Rev. Laws 1800, § 270.

VIRGINIA. None. Code 1873, ch. 33, § 14.

WEST VIRGINIA. "Property belonging to the United States." Code 1868, ch. 29, § 43.

WISCONSIN. " Property owned exclusively by the United States." Rev. Stat. 1878, § 1038.

pal corporations, although not in terms exempted from taxation. *Buckley* v. *Osburn*, 8 Ohio, 180, 187; *Piper* v. *Singer*, 4 S. & R. 354; *Directors of the Poor* v. *School Directors*, 42 Penn. St. 21; *People* v. *Doe*, 36 California, 220; *Worcester County* v. *Worcester*, 116 Mass. 193; *Trustees of Public Schools* v. *Trenton*, 3 Stew. (N. J.) 618, 667; *Rochester* v. *Rush*, 80 N. Y. 302; *State* v. *Hartford*, 50 Conn. 89. The reasons for this have been well stated in the cases in Massachusetts and New Jersey. Mr. Justice Devens, delivering the opinion of the Supreme Judicial Court of Massachusetts, said : "The property of the Commonwealth is exempt from taxation because, as the sovereign power, it receives the taxation through its officers or through the municipalities it creates, that it may from the means thus furnished discharge the duties and pay the expenses of government. Its property constitutes one of the instrumentalities by which it performs its functions." 116 Mass. 194. And Mr. Justice Depue, delivering the opinion of the Court of Errors of New Jersey, said : "The immunity of the property of the State, and of its political subdivisions, from taxation, does not result from a want of power in the legislature to subject such property to taxation. The State may, if it sees fit, subject its property, and the property owned by its municipal divisions, to taxation, in common with other property within its territory. But inasmuch as taxation of public property would necessarily involve other taxation for the payment of the taxes so laid, and thus the public would be taxing itself in order to raise money to pay over to itself, the inference of law is that the general language of statutes prescribing the property which shall be taxable is not applicable to the property of the State or its municipalities. Such property is therefore, by implication, excluded from the operation of laws imposing taxation, unless there is a clear expression of intent to include it." 3 Stew. (N. J.) 681.

In short, under a republican form of government, the whole property of the State is owned and held by the State for public uses, and is not taxable, unless the State which owns and holds it for those uses clearly enacts that it shall share the burden of taxation with other property within its jurisdiction.

Whether the property of one of the States of the Union is taxable under the laws of that State depends upon the intention of the State as manifested by those laws. But whether the property of the United States shall be taxed under the laws of a State depends upon the will of its owner, the United States, and no State can tax the property of the United States without their consent.

The only uncertainty in the decisions of this court upon the subject is to be found in two cases, the one argued at December term, 1847, and the other at December term, 1848, and both reargued by order of the court and decided at December term, 1849, by an equal division of the judges, and therefore not reported, but which appear by the records to have been as follows:

The first of those cases was *United States* v. *Portland*, which, as agreed in the statement of facts upon which it was submitted to the decision of the Circuit Court of the United States for the District of Maine, was an action brought by the United States against the City of Portland to recover back the amount of taxes assessed for county and city purposes, in conformity with the statutes of Maine, upon the land, wharf and building owned by the United States in that city. The building had been erected by the United States for a custom-house, and had always been used for that purpose, and no other. The land, building and wharf were within the legislative jurisdiction of the State of Maine, and had always been so, not having been purchased by the United States with the consent of the legislature of the State. The case was heard in the Circuit Court at May term 1845, and was brought to this court upon a certificate of division of opinion between Mr. Justice Story and Judge Ware on several questions of law, the principal one of which was, whether the building, land and wharf, so owned and occupied by the United States, were legally liable to taxation; and this court, being equally divided in opinion on those questions, remanded the case to the Circuit Court for further proceedings. The action therefore failed. The legislature of Maine having meanwhile, by the statute of 1846, ch. 159, § 5, provided that the property of the United States should be exempted from taxation, the question has-never been renewed.

The second case was that of *Roach* v. *Philadelphia County*, above mentioned, a suit brought by the county of Philadelphia against the treasurer of the mint of the United States to recover State, county and city taxes, which were found by special verdict to have been assessed, pursuant to the statutes of Pennsylvania, upon a certain marble building and a lot of ground upon which it stood, the property of the United States, and the building having been erected and used by the United States, from the time of its completion, under the Constitution and laws of the United States, as a mint for coining money, regulating the value thereof and of foreign coin, and for fixing the standard of weights and measures, and now used for that purpose. The judgment rendered by the Supreme Court of Pennsylvania on March 31, 1845, holding the building and land to have been subject to the assessment and payment of the taxes, was brought to this court by writ of error, and affirmed by an equal division of opinion.

The division of opinion here in those cases was evidently the reason for the guarded form in which the general doctrine was stated, while those cases were pending, by Mr. Justice Woodbury in *United States* v. *Ames*, 1 Woodb. & Min. 76, 85, and presently afterwards by Mr. Justice Grier in *United States* v. *Weise*, 2 Wall. Jr. 72, and by Mr. Crittenden, as Attorney General, in 5 Opinions of Attorneys General, 316, as well as by Mr. Justice McLean, when, in delivering the judgment of this court upholding the validity of a State law taxing all money or exchange brokers, he said: "The taxing power of a State is one of its attributes of sovereignty. And where there has been no compact with the Federal government, or cession of jurisdiction for the purposes specified in the Constitution, this power reaches all the property and business within the State, which are not properly denominated the means of the general government." *Nathan* v. *Louisiana*, 8 How. 73, 82. Somewhat similar language was used by Mr. Justice Clifford in later cases, in which it did not become necessary to define what could properly be considered as "means of the general government." *Society for Savings* v. *Coite*, 6 Wall. 594, 605; *State Tonnage Tax Cases*, 12 Wall. 204, 224; *Ward* v. *Maryland*, 12.

Wall. 418, 427; *Transportation Co.* v. *Wheeling*, 99 U. S. 273, 279.

But the two decisions above mentioned, by an equal division of this court, and with no evidence of the reasons which influenced any of the judges, have no weight as authority in any other case; and we have no hesitation in saying that a tax imposed under authority of a State upon a building used as a custom-house or a mint, and the land on which it stands, owned by the United States, cannot be supported, consistently with the principles affirmed in *McCulloch* v. *Maryland*, especially in 4 Wheat. 432, above cited, or with the recent judgments of this court, some of which have been already referred to.

The liability of the property of the Pacific Railroad Companies to State taxation has been upheld, on the distinction stated in *McCulloch* v. *Maryland*, 4 Wheat. 436, and in *Osborn* v. *Bank of United States*, 9 Wheat. 867, already cited, and reasserted in *National Bank* v. *Commonwealth*, 9 Wall. 353, 362, namely, that although the railroad corporations were agents of the United States, the property taxed was not the property of the United States, but the property of the agents, and a State might tax the property of the agents, provided it did not tax the means employed by the national government. *Thomson* v. *Pacific Railroad*, 9 Wall. 579; *Railroad Co.* v. *Peniston*, 18 Wall. 5. In *Railroad Co.* v. *Peniston*, Mr. Justice Strong, who delivered the principal opinion, dwelt upon the consideration, that the property taxed was not owned by the United States, as essential to support the validity of the tax. 18 Wall. 32, 34. And Mr. Justice Bradley, in a dissenting opinion in which Mr. Justice Field joined, said: "The States cannot tax the powers, the operations, or the property of the United States, nor the means which it employs to carry its powers into execution." 18 Wall. 41.

The cases in which this court has held that the United States have no power under the Constitution to tax either the instrumentalities or the property of a State have a direct and important bearing upon the question before us.

In *Collector* v. *Day*, 11 Wall. 113, it was adjudged that Congress had no power, even by an act taxing all incomes, to levy

a tax upon the salaries of judicial officers of a State, for reasons similar to those on which it had been held in *Dobbins* v. *Erie County Commissioners*, 16 Pet. 435, that a State could not tax the salaries of officers of the United States. Mr. Justice Nelson, in delivering judgment, said : " The general government, and the States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former in its appropriate sphere is supreme; but the States, within the limits of their powers not granted, or, in the language of the Tenth Amendment, 'reserved,' are as independent of the general government as that government within its sphere is independent of the States." 11 Wall. 124.

Applying the same principles, this court, in *United States* v. *Railroad Co.*, 17 Wall. 322, held that a municipal corporation within a State could not be taxed by the United States on the dividends or interest of stock or bonds held by it in a railroad or canal company, because the municipal corporation was a representative of the State, created by the State to exercise a limited portion of its powers of government, and therefore its revenues, like those of the State itself, were not taxable by the United States. The revenues thus adjudged to be exempt from federal taxation were not themselves appropriated to any specific public use, nor derived from property held by the State or by the municipal corporation for any specific public use, but were part of the general income of that corporation, held for the public use in no other sense than all property and income, belonging to it in its municipal character, must be so held. The reasons for exempting all the property and income of a State, or of a municipal corporation, which is a political division of the State, from federal taxation, equally require the exemption of all the property and income of the national government from State taxation.

The latest utterance of this court upon this subject is in a case decided at the present term, in which Mr. Justice Bradley, delivering the judgment of the whole court, upon a question of the extent of the taxing power of a State, said : " We take it to be a point settled beyond all contradiction or question, that

a State has jurisdiction of all persons and things within its territory which do not belong to some other jurisdiction, such as the representatives of foreign governments, with their houses and effects, and property belonging to or in the use of the government of the United States." *Coe* v. *Errol*, 116 U. S. 517, 524.

The United States acquired the title to all the land now in question under the express authority of acts of Congress, and by proceedings the validity of which is clearly established by a series of decisions of this court. Acts of June 7, 1862, ch. 98, § 7, 12 Stat. 423; June 8, 1872, ch. 337, § 4, 17 Stat. 331, and February 8, 1875, ch. 36, § 26, 18 Stat. 313; *Bennett* v. *Hunter*, 9 Wall. 326; *De Treville* v. *Smalls*, 98 U. S. 517; *Keely* v. *Sanders*, 99 U. S. 441; *United States* v. *Taylor*, 104 U. S. 216; *United States* v. *Lawton*, 110 U. S. 146. The imposition of direct taxes upon the land by those acts of Congress was a lawful exercise of the power conferred by the Constitution to lay and collect taxes. The provisions authorizing the United States to sell the land for nonpayment of the taxes assessed thereon, and to purchase the land for the amount of the taxes if no one would bid a higher price, were necessary and proper means for carrying into effect the power to lay and collect the taxes; and so were the provisions authorizing the United States afterwards to sell the land, to apply the proceeds to the payment of the taxes, and to hold any surplus for the benefit of the former owner. While the United States owned the land struck off to them for the amount of the taxes because no one would pay more for it, and until it was sold by the United States for a greater price, or was redeemed by the former owner, the United States held the entire title as security for the payment of the taxes; and it could not be known how much, if anything, beyond the amount of the taxes the land was worth. To allow land, lawfully held by the United States as security for the payment of taxes assessed by and due to them, to be assessed and sold for State taxes, would tend to create a conflict between the officers of the two governments, to deprive the United States of a title lawfully acquired under express acts of Congress, and to defeat the exercise of the constitutional power to lay and collect taxes, to pay the debts and

provide for the common defence and general welfare of the United States.

The question whether the taxes laid under authority of the State can be collected in this suit depends upon the question whether they were lawfully assessed. But all the assessments were unlawful, because made while the land was owned by the United States. The assessments, being unlawful, created no lien, upon the land. Those taxes, therefore, cannot be collected, even since the plaintiffs in error have redeemed or purchased the land from the United States.

Whether the Supreme Court of Tennessee rightly construed the provisions of the Constitution and statutes of the State as not exempting from taxation land belonging to the United States, exclusive jurisdiction over which had not been ceded by the State, is quite immaterial, because, for the reasons and upon the authorities above stated, this court is of opinion that neither the people nor the legislature of Tennessee had power, by constitution or statute, to tax the land in question, so long as the title remained in the United States.

*The result is, that the judgment of the Supreme Court of the State of Tennessee must be reversed, and the case remanded to that court for further proceedings in conformity with this opinion.*