CHAPMAN, Secretary of Interior, et al. v.
SANTA FE PAC. R. CO. et al.

No. 10303.

United States Court of Appeals
District of Columbia Circuit.

Argued April 27, 1950.

Decided Nov. 15, 1951.

Dissenting Opinion March 4, 1952.

Writ of Certiorari Denied June 2, 1952.
See 72 S.Ct. 1058.

Stephens, Chief Judge, dissented.

Wilma C. Martin, Attorney, Department of Justice, Washington, D. C., with whom Asst. Atty. Gen. A. Devitt Vanech and Roger P. Marquis, Attorney, Department of Justice, Washington, D. C., were on the briefs, for appellants.

Frederick Bernays Wiener, Washington, D. C., with whom Lawrence Cake and Alvin Olaf West, Washington, D. C., were on the brief, for appellees.

Before STEPHENS, Chief Judge, and CLARK and WILBUR K. MILLER, Circuit Judges.

CLARK, Circuit Judge.

The appellee, Santa Fe Pacific Railroad Company (hereafter referred to as Santa Fe), is a corporation created by Act of March 3, 1897, c. 374, 29 Stat. 622. The defendants are Oscar L. Chapman, Secretary of Interior, and Marion Clawson, Director of the Bureau of Land Management. The Santa Fe is the successor to the Atlantic and Pacific Railroad Company (hereafter referred to as the Atlantic and Pacific). The land grant was made to the latter under the Act of July 27, 1866, c. 278, 14 Stat. 292, and Santa Fe is fully vested with all the rights of the Atlantic and Pacific granted under the said Act in and to the lands thereby granted.

Congress, by the Act of July 27, 1866, granted the right of way through the public domain for the building of a railroad from Missouri to the Pacific Coast. To aid the construction, the Atlantic and Pacific was granted the odd-numbered sections of public lands for 40 miles either side of its projected line; this area is described as the "place" limits. The Act also granted the right to select within an additional 10 mile limit known as the "indemnity" limits, sufficient lands to make up any deficiency in the "place" limits arising from homestead entries, preemptions, mineral lands, etc.

On March 12, 1872, the Atlantic and Pacific filed with the Secretary of Interior a map of definite location, and thereafter the railroad was constructed. As of the date of filing this map, as stipulated by both parties, the rights to the lands granted became fixed and determined. United States v. Northern Pacific Ry. Co., 1921, 256 U.S. 51, 41 S.Ct. 439, 65 L.Ed. 825.

On February 3, 1886, the Atlantic and Pacific contracted to sell 1,000,000 acres at 50¢ per acre to the Aztec Land and Cattle Company, Limited (hereafter referred to as Aztec). This 1,000,000 acres comprised all the odd-numbered sections within certain described boundaries. Part of the land being sold was within the "place" limits, and at least 98,690.83 acres were within the "indemnity" limits of the grant. The stated consideration of $500,000 was paid by Aztec to Atlantic and Pacific.

In 1886 and 1894 the Atlantic and Pacific conveyed as much land as was then surveyed to Aztec. On August 17, 1898, the above mentioned 98,690.83 acres together with other lands were withdrawn by executive proclamation for a forest reserve described as the Black Mesa Reserve, pursuant to Section 24 of the Act of March 3, 1891, c. 561, 26 Stat. 1095, 1103, 16 U.S.C.A. § 471.

On November 7, 1905, Santa Fe, as successor to Atlantic and Pacific, and in settlement of the claim of Aztec for so much of the said lands as had not at the time been

conveyed to Aztec, executed a deed to Aztec which recited that Atlantic and Pacific had previously conveyed to Aztec 576,701.91 acres of the lands described in the above contract dated February 3, 1886. It further stipulated that Aztec was entitled to an additional 423,298.09 acres, and remised, released and quitclaimed to Aztec all right, title and interest of the Santa Fe, as successor to the Atlantic and Pacific, in and to approximately 423,270.35 acres described in the said deed, which included the before-mentioned 98,690.83 acres.

On April 11, 1921, United States v. Northern Pacific Ry. Co., supra, was decided by the Supreme Court, and at pages 66-67 of 256 U.S., at page 442 of 41 S.Ct., Mr. Justice Van Devanter stated: " * * * after the company earned the right to receive what was intended by the grant it was not admissible for the government to reserve or appropriate to its own uses lands in the indemnity limits required to supply losses in the place limits. Of course, if it could take part of the lands required for that purpose, it could take all and thereby wholly defeat the provision for indemnity. But it cannot do either. The 'substantial right' conferred by that provision (Weyerhauser v. Hoyt, supra [219 U.S. 380, 31 S.Ct. 300, 55 L.Ed. 258]), cannot be thus cut down or extinguished. (Sinking Fund Cases, supra [99 U.S. 700, 25 L.Ed. 496])."

The executive proclamation of August 17, 1898, was not effective to withdraw the lands which included the 98,690.83 acres and the rights of Santa Fe were unimpaired up to and including the time this decision was rendered.

Now, on September 18, 1940, Congress enacted and the President approved the Transportation Act of 1940, c. 722, 54 Stat. 898. Section 321(b) of Title III, Part II, of the Act, 54 Stat. 954, 49 U.S.C.A. § 65, provided certain rate benefits for those land grant railroads which released within a specified period any claims to lands they might have against the United States. This Section further stipulated: "Nothing in this section shall be construed as requiring any such carrier to reconvey to the United States lands which have been here-tofore patented or certified to it, *or to prevent the issuance of patents confirming the title to such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value* or as preventing the issuance of patents to lands listed or selected by such carrier, which listing or selection has heretofore been fully and finally approved by the Secretary of the Interior to the extent that the issuance of such patents may be authorized by law." [Emphasis supplied.]

On December 18, 1940, pursuant to the provisions of Section 321(b) of the Transportation Act, and of the regulations of the Secretary of the Interior thereunder, Santa Fe filed a release of " * * * any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interests granted, claimed to have been granted, or claimed should have been granted by any act of the Congress to Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad."

This release was accepted and approved by the Secretary of Interior on March 1, 1941.

On June 26, 1942, the Santa Fe filed selections in the form prescribed by the Secretary of Interior of the land previously sold to Aztec. Those selections were denied and rejected by the Commissioner of the General Land Office on the ground that " * * * the land had not been ascertained and identified so that the railroad acquired any interest in specific land which it could convey prior to the filing of its release and that, therefore, its transferee is not protected under the saving clause of Section 321(b) of the Transportation Act."

On May 1, 1943, the Santa Fe appealed to the Secretary of Interior from the decision of the Commissioner of the General Land Office rejecting the said selections and after an adverse ruling moved for a rehearing which was denied.

On March 16, 1944, Santa Fe filed its complaint in the present suit, seeking an

injunction restraining the Secretary from rejecting the selection of lands and the application for the patent, and praying for a writ in the nature of mandamus directing him to proceed to determine the right of Santa Fe to have patented the lands in question, notwithstanding the release. Both plaintiff and defendant moved for summary judgment and the lower court granted the plaintiff's motion and denied that of the defendant. On appeal to this court we held in Krug, Sec. of Int., v. Santa Fe Pac. R. Co., 1946, 81 App.D.C. 288, 158 F.2d 317, 320, that the decision as to the defendant's motion was correct, but that the lower court should not have granted the plaintiff's motion for a summary judgment. In holding that the Secretary of Interior's motion for summary judgment was properly denied we stated: "While it is true that, as a general rule, selection is necessary to vest any right to specific indemnity land in the grantee, the Supreme Court has long recognized an exception where there is a deficiency of indemnity land to satisfy losses in place."

This was in effect what the Supreme Court held in United States v. Northern Pacific Ry. Co., supra.

■ The appellants first contend that the release given by Santa Fe is not excepted from the operation of the Transportation Act since Santa Fe had no "title" to the lands which could have been sold to Aztec and confirmed by patent. It is obvious that if the railroad did have a title which it could sell that the lands sold are excepted from the release. The Santa Fe does not contend that it had legal title to the lands it sold. What then was the Santa Fe's interest? The Supreme Court has consistently treated the right to select "place" lands as a vested interest, and, further, it has also treated the right to choose "indemnity" lands in lieu of "place" lands as just such a vested interest. These vested interests arise from the contract between the parties. United States v. Northern Pacific Ry. Co., supra. This vested interest, in the last analysis, consisted of nothing more than the right to choose or select lands. Being assured by this right the Santa Fe's predecessor sold its right to select 1,000,000 acres of land. Before that sale the Santa Fe could have selected for itself after the land had been surveyed, but after the sale Santa Fe was bound to exercise its choice for Aztec. Any failure on Santa Fe's part would have rendered it liable in damages. In the light of these facts we feel Santa Fe did have a right which it could and did sell.

In the United States v. Northern Pacific Ry. Co. case, supra, Mr. Justice Van Devanter said, in effect, that the government could not deprive these land grant railroads of their rights to "place" and "indemnity" lands. And that is in effect what the government is trying to do here. At first no surveys were made which would have enabled the Santa Fe to make selections. Then the specific 98,690.83 acres and other lands were withdrawn as part of a forest reserve. Consequently, no selection could have been made until after the decision in the Forest Reserve case, United States v. Northern Pacific Ry. Co., supra.

It should be remembered that the railroad must select indemnity lands under the direction of the Secretary of Interior, and that officer has consistently ruled no selection can be made or approved until the lands in question are surveyed. The government cannot take advantage of its own wrong or at least its own failure to act. We hold that the right of selection vested at the earliest time there was a deficiency of indemnity lands to satisfy losses in place. The government, by additional surveys could not defeat the Santa Fe's right of selection. The District Court found as a fact that a deficiency did in fact continue up to 1940 and consequently no selection was necessary to vest title in the Santa Fe. This finding was adequately supported by the evidence and in this conclusion we concur.

If there was a deficiency in the indemnity lands to satisfy losses in place, and we so hold, then no selection was necessary by Santa Fe to vest this right in the railroad. This was our decision when this case was before this court the last time, Krug v. Santa Fe Pacific Railroad Co., supra, and we affirm our conclusion there.

The appellants next contend that there was no valuable consideration for Santa Fe's quitclaim deed to Aztec as Santa Fe was under no obligation to select the land for Aztec; this, it is alleged, prevented Aztec from being an innocent purchaser for value within the meaning of the Transportation Act. As we have indicated, Santa Fe was under a duty to select these lands for Aztec. Any other merit in this contention is destroyed by the fact we must agree with the District Court that Aztec was an "innocent purchaser for value" within the meaning of the Transportation Act, supra. That term, as therein used, must be defined in its ordinary commercial sense unless a contrary definition be shown. The term innocent purchaser for value has long been interpreted by our courts as one who purchases in good faith and for value. Not even the appellants will contest the fact that half a million dollars is value; that sum has been paid. There has been no showing that either Aztec or Santa Fe acted in bad faith. The appellants predicate their claim that Aztec was not an innocent purchaser for value on the fact that there was no legal obligation of Santa Fe to select. When that argument fails, and it does here, so must their contention that there was no valuable consideration.

Finally, the appellants contend that the administrative conclusion involved the exercise of discretion, and since it was not plainly wrong is impregnable to mandamus. The appellants have not contended that the Secretary of Interior's decision is not subject to judicial review. From what we have already stated we must conclude the Secretary was plainly wrong. His department in effect was seeking by its own wrongful action or failure to act to deprive this railroad of its vested right to select. That right arose from the contract between the government and the railroad when the railroad undertook to build its line. We agree with the rule of law as cited by the appellants in United States ex rel. Simpson v. Wilbur, 1931, 283 U.S. 414, 51 S.Ct. 502, 75 L.Ed. 1148. Determinations by an administrative agency should not be reversed by means of injunction or mandamus merely because the court may have reached another conclusion. They can only be overturned when the administrative action is unreasonable or plainly wrong. But we do hold that the action by the Secretary was unreasonable and plainly wrong.

The appellants again state the law correctly when they argue that mandamus will lie against executive or administrative officers only when their duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command. Work v. U. S. ex rel. Rives, 1925, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561. The only duty which the Secretary must perform is purely ministerial. He need only issue the patents. Consequently, we do not hesitate to grant mandamus and injunctive relief.

Affirmed.

Chief Judge STEPHENS dissents from this opinion and will file his dissent later.

Dissenting Opinion by Chief Judge Harold M. Stephens to Opinion of Court Filed Herein November 15, 1951
Filed March 4, 1952

STEPHENS, Chief Judge (dissenting)..

I am unable to agree with the disposition of this case by the court. I feel obliged to set forth my views at some length.

This is an appeal from a final judgment entered January 14, 1949 by the United States District Court for the District of Columbia. The judgment enjoined the appellants, the Secretary of the Interior, the Assistant Secretary of the Interior, and the Director of the Bureau of Land Management of the Department of the Interior, from rejecting, on certain specified grounds, an application for the selection of and the issuance of a patent to some ninety-eight thousand acres of land (98,-690.83 acres) located in Arizona.[1] The application had been filed by the appellee Santa Fe Pacific Railroad Company in.

1. The judgment, more specifically described, enjoined the appellants from rejecting the application for the selection of and the issuance of a patent to the lands.

the interest of the appellee Aztec Land & Cattle Company, Ltd. The judgment directed the appellants to proceed to a determination of the application in question without reference to a release executed by the appellee Santa Fe Pacific Railroad Company under Section 321(b) of the Transportation Act of September 18, 1940, 54 Stat. 898, 954–5, 49 U.S.C.A. § 65. Hereafter, for convenience, the appellants will sometimes be referred to as the Government, and the appellees as Santa Fe and Aztec, respectively.

## I

The case out of which the appeal arises has its background in the Act of July 27, 1866, 14 Stat. 292, in the Act of June 7, 1924, c. 291, Title 1, 43 Stat. 486, and in Section 321 of the Transportation Act of September 18, 1940, referred to above. An understanding of the questions involved in the appeal requires an acquaintance also with certain rulings of the Supreme Court concerning the meaning and proper application of statutes enacted by Congress in aid of transcontinental railroad construction needed for the development of the West in the period following the Civil War. The Act of July 27, 1866 was one of such statutes. That Act, entitled "An Act granting Lands to aid in the Construction of a Railroad and Telegraph Line from the States of Missouri and Arkansas to the Pacific Coast", incorporated the Atlantic and Pacific Railroad Company, hereafter sometimes referred to as Atlantic and Pacific, and granted to that company a right of way, including necessary ground for station buildings, workshops, depots, machine shops, switches, sidetracks, turntables and water stations, and granted to the company every odd-numbered alternate section of public land, not mineral and not reserved, sold, granted or otherwise appropriated and free from pre-emption or other claims or rights, to the amount of twenty alternate sections per mile on each side of the railroad line as definitely located

through the territories of the United States and ten alternate sections of land per mile on each side of the railroad line through any state. The Act provided also that if any of the lands so granted were found at the time of definite location of the railroad to have been previously granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, the grantee railroad should have the right to select other lands in odd-numbered sections, in lieu of the sections or parts of sections lost, not more than ten miles beyond the first designated limits of the grant. The first designated limits of the grant under such statutes became known as the "primary" or "place" limits, and the lands therein as "place" lands. The further limits of ten miles beyond the place limits became known as the "indemnity" limits, the odd-numbered sections within those extended limits as "indemnity" lands, or "lieu" lands, and the selections made within those extended limits, in lieu of losses in the place limits, as "indemnity" selections. The Act further provided that Atlantic and Pacific should be a post route and military road, subject to the use of the United States for postal, military, naval and all other Government service, and also subject to such regulations as Congress might impose restricting the charges for such use.

The rulings of the Supreme Court— concerning the meaning and proper application of such statutes as the foregoing —were made in certain decisions which, for full appreciation of their pertinence to the instant case, must be stated at some length: In Payne v. Central Pac. Ry. Co., 1921, 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598, the Act of July 25, 1866, c. 242, 14 Stat. 239, granted lands for railroad construction. A selection of indemnity lands had been made, but before formal approval thereof by the Secretary of the Interior, he withdrew for a waterpower site the lands selected. The suit was to

in question upon the ground that Santa Fe Pacific Railroad Company had not, prior to the filing of the release referred to in the text, acquired any interest in the lands which it could convey to Aztec

Land & Cattle Company, Ltd., or upon the ground that that company was not an innocent purchaser for value of the lands.

enjoin the Secretary and the Commissioner of the General Land Office from canceling the selection. The Court held that by virtue of the selection the rights of the railway company had attached and that the withdrawal by the Secretary was illegal and that the Secretary should be required to dispose of the selection on its merits, unaffected by the withdrawal. In brief, the decision stands for the proposition that a withdrawal by the Government of indemnity lands *after* they have been selected by the railroad company is void. The theory of the decision was that on filing a selection in full faith and compliance with the requisites for a patent to a particular tract the railroad becomes the equitable owner thereof, and for that reason a subsequent withdrawal of the lands selected is legally ineffective. The Court said: "Rightly speaking, the selection is not to be likened to the initial step of one who wishes to obtain the title to public land by future compliance with the law, but rather to the concluding step of one who by full compliance has earned the right to receive the title."

The Payne case served as a background for the decision in United States v. Northern Pac. Ry. Co., 1921, 256 U.S. 51, 41 S. Ct. 439, 65 L.Ed. 825, commonly referred to in the reports as the "Forest Reserve case." In that case a withdrawal by the Secretary of the Interior of indemnity lands was made *before* selection and was held void. The Northern Pacific Railroad Company, the predecessor in interest of the Northern Pacific Railway Company, was incorporated and granted lands by the Act of July 2, 1864, c. 217, 13 Stat. 365. Under that Act, as modified and supplemented by a Joint Resolution of May 31, 1870, 16 Stat. 378, the railroad company on several occasions prior to 1904 attempted to select lands within the indemnity limits of the grant for the purpose of satisfying place land losses. For the reason that at that time the lands were still unsurveyed the Secretary of the Interior refused to consider the selections. In 1904 the Secretary made a temporary withdrawal of the lands, still unsurveyed, for the purpose of preventing an acquisition of any claim to them pending an inquiry into the desirability of adding them to the forest reserves. On April 5, 1905, a survey having been completed, the plat thereof was filed. Immediately thereafter—on that same day—the railroad company filed its selection. The lands selected were necessary to fill up place land losses. Thereafter (at a date not described in the opinion of the Court) patents were inadvertently issued to the railroad company by the Secretary of the Interior notwithstanding his previous temporary withdrawal of the lands. In 1906 the Secretary made the temporary withdrawal permanent. The action in the case was by the Government to cancel the patents as inadvertently issued. It was contended by the Government that no right to lands within the indemnity limits attached, either generally or specifically, until they were selected by the railroad company and that up to the time of selection the Government was free to reserve the lands for its own purposes and thereby to cut off the right of selection even where the losses in the place limits exceeded the available land in the indemnity limits, and although the railroad company's purpose to claim the lands in the indemnity limits was asserted at the earliest opportunity. The railroad company urged, to the contrary, that where (through preemption, homestead entries or other disposals) the lands in the indemnity limits had been so far diminished that all that remained of them were needed to supply the losses in the place limits the Government was not at liberty to reserve the remaining indemnity lands, or any of them, for its own uses and thereby to cut off the railroad company's right to claim them. The theory of the company was that, as against the Government, the remaining indemnity lands were appropriated to the fulfillment of the Government's obligation under the grant and that the company had a vested right in the fulfillment of that obligation. The Supreme Court sustained the contention of the company. The Court ruled that the land grant statute was in effect a proposal to the company that if it would undertake construction of the railroad it would receive in return the lands comprehended in the grant, and that upon acceptance of that

proposal and construction of the railroad and acceptance thereof by the President the proposal was converted into a contract to the performance of which by the Government the company became entitled as a result of having performed its part. The Court was of the view, citing the Payne case, that the provision relating to indemnity lands was as much a part of the grant and contract as the one relating to place lands; that it was the purpose of Congress in making the grant to confer a substantial right to lands within the indemnity limits in lieu of place lands lost, and that such right was within the protection of due process clause of the Constitution. Specifically the Court held, therefore, that after the railroad company had earned the right to receive the lands comprehended in the grant the Government was not free to reserve or to appropriate to its own use the lands in the indemnity limits which were required to replace place land losses. The Court said:

"While it often has been said that under such a grant no right attaches to any specific land within the indemnity limits until it is selected, an examination of the cases will show that this general rule never has been applied as between the Government and the grantee where the lands available for indemnity were not sufficient for the purpose. Its only application has been where either the rights of settlers were involved, or the lands available for indemnity exceeded the losses, thereby making it essential that there be a selection and identification of the particular lands sought to be taken. This distinction is illustrated in St. Paul & Pacific R. R. Co. v. Northern Pacific R. R. Co., 139 U.S. 1 [11 S.Ct. 389, 35 L.Ed. 77.] The question there presented was whether there was any need for a selection where no right of a settler was involved and the lands available for indemnity were not sufficient to supply the losses. By reason of this insufficiency it was ruled that the lands in the indemnity limits necessarily were appropriated to satisfy the losses and that no selection was required. The court said [139 U.S. at page 19, 11 S.Ct. at page 395]: 'As to the objection that no evidence was produced of any selection by the Secretary of the Interior from the indemnity lands to make up for the deficiencies found in the lands within the place limits, it is sufficient to observe that all the lands within the indemnity limits only made up in part for these deficiencies. There was, therefore, no occasion for the exercise of the judgment of the Secretary in selecting from them, for they were all appropriated.'" [256 U.S. at pages 65–66, 41 S.Ct. at page 442].

Although the case was thus decided by the Supreme Court under the theory advanced by the railroad company the Court found it necessary to remand the case for further proceedings for the purpose of determining the question of the asserted deficiency in the lands within the indemnity limits to satisfy place land losses. In brief, the decision of the Court in the Forest Reserve case stands for the proposition that where indemnity lands are insufficient to fill up place land losses withdrawal of the same by the Government *prior* to selection is legally ineffective.

As a result of the remand of the Forest Reserve case there was ultimately decided by the Supreme Court a third case, United States v. Northern Pacific Ry. Co., 1940, 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210, a part of the rulings in which are pertinent to the instant appeal. That case arose as follows: Upon the decision of the Forest Reserve case it became apparent to the Government that if the indemnity claim of the railroad, including a right to withdrawn lands in the event of a deficiency in unwithdrawn lands to satisfy place land losses, were sustained, much of the land withdrawn for forest reserve purposes would be diverted from the same. A Joint Committee of Congress appointed to investigate the conflicting claims of the Government and the railroad to withdrawn indemnity lands recommended the enactment of legislation authorizing a suit by the Attorney General to procure a final determination of the respective rights of the Government and the railroad, to the end that the grant should be finally adjusted and the interests of both the Government and the railroad fully protected. This resulted in the Act of June 25, 1929, 46 Stat. 41, 43 U.S. C.A. § 921 et seq. That Act declared forfeited to the United States certain claimed rights asserted by the railroad to indemnity lands within the boundaries of any national forest or any other Government reservation and directed that the railroad should receive from the Government such compensation, if any, as the courts should hold due for the loss of the lands forfeited. The Act directed the Attorney General to institute an action to determine all questions of law and fact germane to complete adjudication of the respective rights of the

Government and the company under the Act of July 2, 1864 and the Resolution of May 31, 1870, as amended; the Act established venue in, among others, the United States District Court for the Eastern District of Washington. Pursuant to the Act, the Attorney General caused a bill to be filed in the district court mentioned. After proceedings before a master the court rendered a decision holding the railroad entitled to patents to certain lands outside the reserves and to compensation for certain lands within them. Thereafter, Congress, by the Act of May 22, 1936, 49 Stat. 1369, 43 U.S.C.A. § 925 note, authorized a direct appeal to the Supreme Court. Errors were assigned to the district court's decree by both the Government and the railroad. Also, the Government put forward certain claims which, if sustained, would have precluded any recovery by the railroad. These were separately discussed in the opinion of the Court, written by Mr. Justice Roberts. Two of the claims, numbers 7 and 15, resulted in rulings pertinent to the instant appeal.

Claim 7 read as follows: *"The claim that no compensation should have been awarded because unsurveyed public lands were available for selection, and the company failed to show that it would, or could, have selected and obtained all of the withdrawn lands."* [311 U.S. at page 342, 61 S.Ct. at page 275] The district court had found that on March 1, 1898, just prior to the first forest withdrawal, the railroad had unsatisfied losses of 5,946,664 acres under the grant of July 2, 1864 and that the total lands available for selection, as of that date, were 1,137,508 acres—leaving a deficiency of 4,809,156 acres; that the deficiency in the grant under the Joint Resolution of May 31, 1870, excluding available land in second indemnity limits, at March 1, 1898, was 593,656 acres, and that there had been ever since a deficiency in respect

of that grant.[2] In making these findings, the district court computed as lands available for selection only non-mineral *surveyed* vacant lands. The railroad asserted that in this the district court was right. But the Government insisted that vacant *unsurveyed* lands were 'available' as indemnity to the railroad, notwithstanding a concession that, as lands selected must be identified, the railroad could not select them until they had been surveyed.[3] The Government urged that the railroad failed to show that there were not ample *unsurveyed* lands within the indemnity limits to offset losses in the place limits at the time of the withdrawals. The Government added that, inasmuch as homesteaders might, in the interim, have obtained prior rights by actual settlement of the unsurveyed lands, it was a matter of speculation whether the railroad would ultimately have obtained adequate indemnity, even if unsurveyed lands had not been withdrawn for forest reserve purposes. The Government further urged that, if the district court had treated *unsurveyed* lands as available for indemnity selection, there would have been no deficiency at the dates of the withdrawals.

The Supreme Court held that these contentions of the Government could not be sustained. It said that the decision turned on the inquiry as to what lands were available to the railroad for selection at the time of the respective governmental withdrawals. The Court pointed out that in the first place, the railroad could not select mineral lands. It then commented that by Section 3 of the Act of July 2, 1864 it was provided that, whenever any of the place lands granted, which shall have been, prior to the time of definite location of the road, "granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall *be selected by said company in lieu there-*

---

2. The Joint Resolution of May 31, 1870, authorized "second indemnity" belts ten miles wide, on either side of the original indemnity limits in any state or territory in which the railroad could not obtain the number of sections intended for it by its charter.

3. See footnote 18, page 343 of 311 U.S., page 276 of 61 S.Ct., citing Federal and Supreme Court cases for this proposition —including Cox v. Hart, 260 U.S. 427, 436, 43 S.Ct. 154, 67 L.Ed. 332.

*of, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers . . ..*" [311 U.S. at page 344, 61 S.Ct. at page 276]. The Court then said:

"The fact that the lands in the indemnity limits are, before survey, subject to be taken by pre-emptors and settlers, and thus ultimate satisfaction of the railroad company may be defeated, does not justify the Government itself in reserving lands contained within those limits and thus rendering impossible the company's obtaining them. This was definitely held in the Forest Reserve Case.

"Much was said in argument as to the meaning of the phrase 'lands available as indemnity' as used in that case. It seems clear that unsurveyed lands are not available to the company under the Act of 1864. It will be observed that the company must select indemnity lands under the direction of the Secretary of the Interior. That officer has invariably ruled that no selection can be made or approved until the lands in question are surveyed.

"This ruling was necessitated by the very terms of the Act of 1864, which requires selection of alternate sections designated by odd numbers. Obviously, until surveyed, no odd-numbered sections could exist. Unsurveyed lands are not public lands." [Footnotes omitted]

The Court then concluded, on this subject, as follows:

"The decision in the Forest Reserve Case, supra, did not suggest any different view. The allegation of deficiency in indemnity lands in that case, found in the stipulation of the parties, was that the lands were those odd-numbered sections which the defendant was entitled to select under the regulations of the Land Department. This could only mean, and the decision could only have gone upon the view that it meant, that the surveyed lands within the indemnity limits were deficient to meet the selection rights of the railroad company. The case is not an authority, as the Government contends, for the proposition that unsurveyed vacant lands within the indemnity limits are to be considered as available to the company in ascertaining whether the Government has reserved to itself lands as to which the company has selection rights. Under the doctrine of the Forest Reserve Case the challenged withdrawals for forest and other governmental purposes left the indemnity lands available to the company deficient to satisfy its rights of selection.

"The holding was that the withdrawals were void and the company's rights remained as if the withdrawals had never been made. If and when any of the withdrawn lands were surveyed the company was entitled to select them, as it did in the Forest Reserve Case." [311 U.S. at page 345, 61 S.Ct. at page 277]

The Government argued further that, even though the withdrawals for governmental purposes created such a deficiency of lands available for selection that, to satisfy the grant, the railroad would have been compelled to select lands within the withdrawn reserves, nevertheless, in order to obtain the indemnity for the deficiency so created, the railroad was bound to prove that it would have selected lands within the reservation, and what lands it would have selected, before it could claim compensation from the Government for the deprivation of its right to select. The majority of the Supreme Court ruled that this position was untenable. The Court said:

"Under the ruling in the Forest Reserve Case it was the obligation of the Government to refrain from any action which would deprive the company of its right of selection in accordance with the terms of the grant. When the United States withdrew the lands for forest and other reserves it signified its purpose to retain them for its own use and not to allow the company or anyone else to obtain them, any law or contract to the contrary notwithstanding. We think the company's right of selection, to the extent of the deficiency in the grant, remained available as to the withdrawn lands, provided the lands selected were such as are defined in the grant. The Government's contention that no one can say how soon the lands would have been surveyed and selected if they had not been withdrawn and reserved, or, if they had remained unsurveyed and not withdrawn, what areas would have been taken up by settlers and pre-emptors, does not avail to abrogate or qualify the company's right to exercise its privilege of selection notwithstanding the withdrawals. Moreover, the argument ignores the repeal of the pre-emption laws by the Act of March 3, 1891." [311 U.S. at pages 346–347, 61 S.Ct. at pages 277–278] [Footnotes omitted]

Claim 15 was in the following terms: "*The claim that the United States is liable to account to the Railway Company only for the ascertained deficiency at the time of withdrawal.*" [311 U.S. at page 364, 61 S.Ct. at page 285] In respect of this the Court ruled:

"In its brief upon reargument the Government takes the position that even if the withdrawals left the grant deficient in lands lying in the second indemnity limits, the United States is liable to account to the Railway Company only for the amount of such deficiency. The District Court held that if a given withdrawal had the effect of leaving within the indemnity limits an insufficient acreage to satisfy the selection rights of the company the withdrawal was a breach of the Government's obligation because thereby the Government disenabled itself to carry out that obligation. The consequence which the District Court attached to such action on the part of the Gov-

ernment was that the lands withdrawn were, notwithstanding the withdrawal, still open to selection by the company if and when surveyed. The court below thought that, as the company was entitled, under the terms of the grant, to exercise its selection rights with respect to the withdrawn lands in these circumstances, the Act of 1929 contemplated that it should be compensated for the deprivation of that right.

"We think that the District Court was right and that the Government's position that it is liable to account only for any deficiency in the vacant lands at the time of withdrawal is not in accord with the granting act of 1864. The Forest Reserve Case, supra, supports the decision below. It is clearly there held that if, by the Government's own act in withdrawing lands from the indemnity limits, it leaves insufficient vacant land available for selection the company thereby becomes entitled to select lands within the indemnity limits. That is exactly what was done by the company which brought about the litigation in the Forest Reserve Case. The decision is clear to the effect that, assuming the grant was deficient (which was the matter the court could not determine on the record then presented), the company was entitled to select lands within the reserve." [311 U.S. at pages 364–365, 61 S.Ct. at pages 285–286]

It has been noted at the outset of this topic I that the Act of July 27, 1866, constituted the Atlantic and Pacific Railroad Company a post route and military road, subject to the use of the United States for postal, military, naval, and all other government services, and subject also to such regulations as Congress might impose restricting the charges for such Government use. By the Act of June 7, 1924, also referred to above, it was provided in respect of charges for transportation by land grant railroads subject to regulation by Congress that: " . . . hereafter payment shall be made at such rates as the Secretary of War shall deem just and reasonable and shall not exceed 50 per centum of the full amount of compensation, computed on the basis of the tariff or lower special rates for like transportation performed for the public at large, for the transportation of property or troops of the United States over any railroad . . . which was aided in its construction by a grant of land on condition that such railroad should be a post route and military road, subject to such regulations as Congress may impose restricting the charge for such Government transportation, and such payment shall be accepted as in full for all demands for such service." But on September 18, 1940, Congress enacted, and the President approved, the Transportation Act of 1940, above cited. The purpose of Section 321 thereof, so far as is here pertinent, was to relinquish the existing right of the United States to reduced rates for transportation by a land grant railroad in consideration of a release by such railroad of any claim which it might have against the United States "to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which had been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier or . . . predecessor in interest . . . ." Section 321(b) provided, however, that:

"Nothing in this section shall be construed as requiring any such carrier to reconvey to the United States lands which have been heretofore patented or certified to it, or to prevent the issuance of patents confirming the title to such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value or as preventing the issuance of patents to lands listed or selected by such carrier, which listing or selection has heretofore been fully and finally approved by the Secretary of the Interior to the extent that the issuance of such patents may be authorized by law." [54 Stat. at pages 954–955]

## II

On March 16, 1944, Santa Fe and Aztec filed in the district court the complaint which initiated the action out of which this appeal has arisen. The allegations of the complaint—stating them only so far as necessary to an understanding of the questions involved in the appeal—were, in substance and effect, as follows:

Santa Fe sues in its own right and also as successor to the Atlantic and Pacific Railroad Company and as successor to the land grant to that company under the Act of July 27, 1866. Santa Fe is vested with the rights of Atlantic and Pacific in and to the lands granted Atlantic and Pacific by that Act. On March 12, 1872, Atlantic and Pacific filed with the Secretary of the Interior its map of definite location, and thereafter the railroad was constructed and the rights of Atlantic and Pacific to the lands granted became fixed and determined. The grant as finally fixed extended along the line of the railroad from a point in what is now the State of New Mexico through what are now the States of New Mexico and Arizona to the west boundary of Arizona at the Colorado River. On February 3, 1886, Atlantic and Pacific by contract sold to Aztec for fifty cents per acre approximately one million acres of land within the limits of the grant in the then Territories of Arizona and

New Mexico comprising all of the odd-numbered sections within certain described boundaries. The lands sold were designated and described by section, township and range, although at that time unsurveyed. A part of the lands sold were within the place limits of the grant and a part within the indemnity limits. Subsequently, in 1886 and 1894, so much of the lands as were then surveyed were conveyed by Atlantic and Pacific to Aztec by deed duly recorded. In 1905 the remainder of the lands sold, both surveyed and unsurveyed, were, by quitclaim deed recorded, conveyed to Aztec by Santa Fe as successor to Atlantic and Pacific. Included in the lands so sold and conveyed to Aztec were the 98,690.83 acres of land in suit. All of these were and are within the indemnity limits of the Atlantic and Pacific grant. (A description, as set forth in the complaint, of the lands in suit is given in the margin.[4])

In 1887 Atlantic and Pacific filed with the Secretary of the Interior a selection of certain of the lands within the indemnity limits of the grant, including the lands in suit, for the purpose of satisfying losses in the place limits. But that selection was rejected by the Secretary upon the ground that the lands were then unsurveyed and therefore not then available for selection. No other selection of the lands in suit has been made by Atlantic and Pacific or by Santa Fe until the selection made in an application of June 26, 1942, below described.

On August 17, 1898, the lands in suit were withdrawn by Executive Proclamation of that date for the Black Mesa Forest Reserve, and such lands are now included within what are known as Coconino and Sitgreaves National Forests. At the time of this withdrawal and for sometime prior thereto and at all times since then the losses in the place limits of the Atlantic and Pacific grant exceeded the surveyed lands within the indemnity limits available for selection, and to that extent there has been a deficiency in the grant since sometime prior to the withdrawal of August 17, 1898, which has at no time been less than 100,000 acres.

On December 18, 1940, Santa Fe filed with the Secretary of the Interior, pursuant to Section 321(b) of the Transportation Act of September 18, 1940, and regulations of the Secretary prescribed thereunder, a release of "any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interests granted, claimed to have been granted, or [sic] claimed should have been granted by any act of the Congress to Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad." That release was accepted and approved by the Secretary on March 1, 1941. At the time of filing the release Santa Fe also filed with the Secretary, in compliance with regulations prescribed by him under Section 321(b) of the Transportation Act of 1940, a list of all innocent purchasers for value to whom Santa Fe, or its predecessor Atlantic and Pacific, had sold any of the unpatented lands within the limits of the Atlantic and Pacific grant prior to September 18, 1940, with a description of the lands so sold. That list included the name of Aztec Land & Cattle Company and a description of the lands sold to that company as above set forth.

On June 26, 1942, Santa Fe filed with the Commissioner of the General Land Office (now the Bureau of Land Management) in the Department of the Interior an application for the selection of, and issuance of patent to, the lands described above as lands sold to an innocent purchaser for value prior to September

4. Arizona, G. and S. R. M.

|  |  | Area |
|---|---|---|
| T. 13 N., R. 9 E., secs. | 5, 7, 9 | 1,862.08 acres |
| T. 14 N., R. 9 E., secs. | 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 10,993.07 acres |
| T. 14 N., R. 11 E., secs. | 33, E½; 35, SW¼ (unsurveyed) | 480.00 acres |
| T. 13 N., R. 12 E., secs. | 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 11,802.56 acres |
| T. 14 N., R. 12 E., secs. | 3, 5, 7, 9, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 10,134.32 acres |
| T. 15 N., R. 12 E., secs. | 31, 33 | 1,458.08 acres |
| T. 13 N., R. 13 E., secs. | 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 11,849.78 acres |
| T. 14 N., R. 13 E., secs. | 19, 21, 29, 31, 33 | 3,439.44 acres |
| T. 13 N., R. 14 E., secs. | 19, 21, 23, 25, 27, 29, 31, 33, 35 | 5,736.51 acres |
| T. 13 N., R. 15 E., secs. | 19, 21, 23, 25, 27, 29, 31, 33, 35 | 5,717.59 acres |
| T. 12 N., R. 16 E., secs. | 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 9,256.84 acres |
| T. 12 N., R. 17 E., secs. | 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 8,465.20 acres |
| T. 10 N., R. 20 E., secs. | 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23 | 7,469.47 acres |
| T. 11 N., R. 21 E., secs. | 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | 10,025.89 acres |
| Total | | 98,690.83 acres |

18, 1940, and excepted from the release filed by Santa Fe pursuant to Section 321(b) of the Transportation Act of 1940, and subject to selection and patent as indemnity lands acquired for the satisfaction of place land losses in the grant under the Act of July 27, 1866. On April 8, 1943, the Commissioner notified Santa Fe and Aztec of the denial and rejection of that application upon the ground that "the land had not been ascertained and identified so that the railroad acquired any interest in specific land which it could convey prior to the filing of its release and that, therefore, its transferee is not protected under the saving clause of section 321(b) of the Transportation Act." On or about May 1, 1943, Santa Fe appealed to the Secretary of the Interior from the decision of the Commissioner rejecting the application. On January 8, 1944, the Assistant Secretary of the Interior, acting for the Secretary, affirmed the decision of the Commissioner. On January 27, 1944, Santa Fe filed with the Secretary of the Interior a motion for rehearing. On February 8, 1944, that motion was denied by the Assistant Secretary of the Interior.

The lands in suit are within the indemnity limits of the Atlantic and Pacific grant under the Act of July 27, 1866, and are non-mineral public lands, not reserved, sold, granted, or otherwise lawfully appropriated, and are free from pre-emption or other claims or rights. The withdrawal of such lands for forest reserve purposes on August 17, 1898, was void because at the time of the withdrawal there was, as alleged above, a large deficiency in the grant, and the lands were then and have ever since been appropriated to satisfy losses in the place limits. The release filed by Santa Fe pursuant to Section 321(b) of the Transportation Act of 1940 is not applicable to the lands in suit because they were expressly excepted therefrom, having been sold prior to September 18, 1940, to Aztec, an innocent purchaser for value. The action of the Secretary in rejecting the selection of the lands in suit and the application for a patent thereto by Santa Fe, in the interest of Aztec as purchaser of the lands, was based upon an erroneous construction of the applicable laws, was arbitrary and beyond the authority of the Secretary and was in violation of the vested rights of Santa Fe and Aztec and casts a cloud on their title to such lands.

Santa Fe and Aztec prayed for a decree enjoining the Government from rejecting the selection of the lands in suit and the application for a patent thereto, and directing the Government "to determine the right of . . . Santa Fe . . . to select the lands in question and to the issuance of a patent, without regard to the . . . release" filed by

Santa Fe under Section 321 (b) of the Transportation Act of 1940.

Upon the filing of the complaint in the district court by Santa Fe and Aztec the Government, without then filing an answer, filed a motion for summary judgment in its own favor upon the ground that there was no genuine issue as to any material fact and that the Government was, therefore, entitled to a judgment as a matter of law. To the Government's motion there were attached certain exhibits.[5] Santa Fe and Aztec also filed a motion for summary judgment in their own favor upon the ground that the pleadings filed, namely the complaint, the Government's motion for summary judgment, and the exhibits attached thereto, showed that there was no genuine issue as to any material fact and that Santa Fe and Aztec were, therefore, entitled to judgment granting, as a matter of law, the relief prayed for in their complaint. Later, but before hearing on the two motions, the Government filed an affidavit stating that for the reason that it was of the opinion that the release filed by Santa Fe on December 18, 1940 barred the right of Santa Fe and Aztec to the lands in question, the Government had no reason in its decisions of January 8 and February 8, 1944 (the decisions affirming the rejection by the Commissioner of the General Land Office of Santa Fe's application for the selection of and issuance of a patent to the lands in suit—and denying Santa Fe's motion for rehearing) to pass upon, and that it had made no determination as to, the truth or falsity of the allegation of the complaint that the losses in place lands had exceeded the surveyed lands within the indemnity limits of the grant at all times since before August 17, 1898, or of the allegation that the lands in question were non-mineral public lands, not reserved, sold, granted, or otherwise lawfully appropriated, and free from pre-emption or other claims or rights, or of the allegation that Aztec was an innocent purchaser

---

5. The exhibits were apparently copies of the opinion of the Secretary of the Interior rejecting Santa Fe's application for a patent, a copy of the Secretary's refusal to reconsider the rejection, and copies of Santa Fe's contract of sale and quitclaim deed to Aztec.

for value of such lands. The affidavit stated further that the Government was, in consequence, without knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, denied the same.

The case was submitted to the district court on the two motions for summary judgment and the exhibits and affidavit referred to. The district court denied the motion of the Government and granted that of Santa Fe and Aztec and entered final judgment in their favor. The Government then appealed from that judgment to this court. This court ruled that the Government's motion was properly denied but that the summary judgment in favor of Santa Fe and Aztec should not have been entered, and the court reversed the same and remanded the case for further proceedings in accordance with its opinion, if and when an answer was filed by the Government. Krug v. Santa Fe Pac. R. Co., 1946, 81 U.S.App.D.C. 288, 158 F.2d 317. The opinion of this court, written by then Chief Justice Groner, stated, as reasons for the decision, in substance and effect the following:

The Government upon its motion for summary judgment had argued to the district court—and had insisted upon the appeal—that the existence of a deficiency of indemnity lands to make up place land losses was not material since Santa Fe had made no selection of lands and without selection had no i terest which could be conveyed to Aztec. If that contention of the Government was correct, then its motion for summary judgment should have been granted by the district court; but if the contention was not correct, and if the theory of Santa Fe and Aztec that formal selection was unnecessary when a deficiency of the indemnity lands existed was correct, then, though a summary judgment should not have been entered in favor of the Government, neither could such a judgment be properly entered for Santa Fe or Aztec—for the reason that if their theory was correct the Government was not prepared to admit the fact of a deficiency, i. e., there was a genuine issue as to a material fact. And—ruled the court— the contention of the Government was incorrect and the theory of Santa Fe and Aztec was correct—and the district court rightly so decided: because while it is true that, as a general rule, selection is necessary to vest any right to specific indemnity lands in a railroad grantee, the Supreme Court has long recognized an exception where there is a deficiency of indemnity land to satisfy place land losses. (Here the opinion cited United States v. Northern Pac. Ry. Co., 256 U.S. 51, 65, 41 S.Ct. 439, 65 L.Ed. 825, the Forest Reserve case.) The fact that the lands in suit were withdrawn for inclusion in a national forest reserve did not operate to defeat such rights as Santa Fe and Aztec may have had in the lands. (Here the opinion cited United States v. Northern Pacific Ry. Co., 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210.) Therefore, the court was of the view—according to Judge Groner's opinion—that "in the circumstances described in the complaint,—if proved on the trial—" the lands involved in the suit were identified without the formality of a selection, and as a result the right of Santa Fe attached and the issuance of a patent to the lands became a duty of the Secretary of the Interior. (Here the opinion cited St. Paul & Pacific v. Northern Pacific, 139 U.S. 1, 11 S. Ct. 389, 35 L.Ed. 77, the case relied upon, as appears above, by the Supreme Court in its decision in the Forest Reserve case.)

Then followed the ruling described above.

In short, this court in thus remanding the case for further proceedings in the district court accepted the legal theory of Santa Fe and Aztec which underlay their complaint that selection of indemnity lands is unnecessary when a deficiency to fill up place land losses exists; and the court remanded the case for a hearing on the question of fact as to the existence of a deficiency "in the circumstances described in the complaint,—if proved on the trial." It is important to note that "the circumstances described in the complaint," i. e., the allegations of the complaint in respect of a deficiency, were, as appears above, that there had been a deficiency of indemnity lands to fill up place land losses from sometime prior to August 17, 1898, the date of the withdrawal, and "at all times since" which at no time had been less than 100,000 acres. It was this continuing deficiency upon which the case of Santa Fe and Aztec was based, not upon a deficiency for a lesser period of time than that described. Clearly, under the remand, if such a deficiency was shown Santa Fe and Aztec were to prevail. But it is equally clear that if such a deficiency was not shown the Government was to have judgment—because it was not in dispute that Santa Fe had made no selection and the court, in its opinion by Judge Groner, recognized that as a general rule, that is, in the absence of a deficiency, selection is necessary to vest a right to specific indemnity lands in the railroad under the land grant statutes. The foregoing limitations of the

remand, and the rulings upon which they were based, became the law of the case.

After the remand of the case to the district court the Government filed an answer to the complaint of Santa Fe and Aztec. The answer admitted all of the allegations of fact in the complaint except the allegation as to a deficiency, the allegation that Aztec was a bona fide purchaser for value of the lands in suit, and the allegation that at the time of the asserted 1905 conveyance of the lands in suit to Aztec by Santa Fe some of the lands had been surveyed. All of those allegations of fact were put in issue by the Government's answer. The answer denied also the allegations of the complaint that the lands in suit were "sold" and "conveyed" by Santa Fe to Aztec. But those allegations were really allegations of law, i. e., they were intended as assertions that an interest in the lands had arisen in Santa Fe and become the subject of the contract of sale and deeds referred to in the complaint. The Government, by its denial, apparently did not intend to deny the execution of a contract of sale or the execution and recordation of deeds, but only to raise an issue of law as to whether an interest in the lands in suit had arisen in Santa Fe which could be transferred to Aztec. That is to say, the Government was contending that there was no deficiency of indemnity lands as alleged, but on the contrary an excess, and that, as there was admittedly no selection of the lands in suit prior to the enactment of the Transportation Act of September 18, 1940, no interest in the lands had ever arisen in Santa Fe which could be the subject of a sale to Aztec. The Government was relying upon the general rule recognized in the Payne and Forest Reserve cases that where there is an excess of indemnity lands to satisfy place land losses no right attaches to any specific lands within the indemnity limits until they are selected.

After the filing of the answer by the Government a stipulation of facts was entered into between the Government and Santa Fe and Aztec and filed with the district court. The facts agreed upon included all of the facts alleged in the complaint which were not put in issue by the answer. They included also facts relevant to the deficiency issue, and facts relevant to an issue of estoppel which was not, in terms, raised by the complaint and answer, but which, as will appear below, is a subject of contention on this appeal. The facts agreed upon which are relevant to the issue of estoppel were the following:

On November 30, 1931, the Commissioner of the General Land Office submitted to the Secretary of the Interior in an "office letter" a statement of a "tentative readjustment" of the grant of July 27, 1866, to Atlantic and Pacific. That readjustment included a statement of the place land losses and of the indemnity lands available to fill the same and included within such indemnity lands the vacant lands, both surveyed and unsurveyed, within the indemnity limits. That readjustment and the "theory under which it was made" was approved by the Assistant Secretary of the Interior on December 9, 1931. On December 16, 1931, a statement of the readjustment as approved was sent to the law firm of Britton and Gray in Washington, D. C., representing Santa Fe. Britton and Gray thereafter filed a protest with the Commissioner taking exception to treating in the readjustment the vacant *unsurveyed* lands in the indemnity limits as available for indemnity. On March 22, 1932, the Commissioner, with the approval of the Assistant Secretary of the Interior, ruled as follows:

\* \* \*

"In the adjustment of railroad grants having indemnity limits such as the grant here in question, it has always been the uniform and accepted rule, to charge against the grant as available for indemnity all lands within the indemnity limits which are vacant and applicable and not only those that are available for immediate selection. While it may be said that the unsurveyed lands in the indemnity limits are only potentially available, they are nevertheless applicable to the grant, subject to possible future selection, and until disposed of adversely to the company it is only proper to treat them as available in the adjustment.

"The same question was raised by the Northern Pacific Railway Company in connection with the adjustment of its grant and this office after due and careful consideration, having well in mind the ruling laid down by the United States Supreme Court, in its decision in the case of United States v. Northern Pacific Railway Company (256 U.S. 51 [41 S.Ct. 439, 65 L.Ed. 825]), pursuant to which the adjustment of that grant was made, held (letter "F" of March 5, 1925, addressed to the Secretary of the Interior), that:

'Lack of survey \* \* \* did not dispose of the land, and until disposed of adversely to the company the land remained available to the future claim of the company and should, therefore, be considered as available until such adverse disposal takes place.'

"Said ruling or conclusion was approved by the Secretary of the Interior in his report of

March 25, 1925, to 'Hon. N. J. Sinnott, Chairman Joint Committee, Northern Pacific Land Grant.'

"In view of the foregoing it is, therefore, concluded that the vacant unsurveyed lands in the indemnity limits of the grant here in question are, until disposed of adversely to the company, available in satisfaction of losses in place, and as such it is proper to charge the same against the grant in the adjustment thereof. There is, therefore, no occasion for disturbing or modifying the adjustment in that respect."

&ast; &ast; &ast;

The facts. agreed upon with respect to the deficiency issue were, stating them in substance and effect, these:

On July 16, 1947, in response to a request of the Attorney General, the Undersecretary of the Interior made certain administrative findings, including a finding to the effect that since December 31, 1924, there had been no deficiency in surveyed lands available for selection within the indemnity limits of the grant to Atlantic and Pacific to make up for losses in the place limits. In reaching that finding, the Undersecretary caused, an examination to be made of the books and records of the Bureau of Land Management (formerly the General Land Office) the results of which were set forth in certain schedules A and B to said findings. Those schedules became Exhibit 24 attached to the stipulation. They comprised figures which truly and correctly showed as of March 12, 1872, and annually as of December 31 of each year from 1872 to 1940, inclusive: (a) the total area of the odd-numbered sections within the indemnity limits of the Atlantic and Pacific grant; (b) disposals of indemnity lands other than to the company; (c)

unsurveyed indemnity lands (both vacant and withdrawn); and (d) surveyed indemnity lands (both vacant and withdrawn).6 Those figures (according to the stipulation) "may be adopted as part of the [court's] findings of fact and may be used as the basis for such ultimate findings of fact as the parties may request or the Court may make."

The stipulation as worded appears not to include an agreement as to the correctness of the figure shown in Exhibit 24 with respect to total place land losses. But throughout the briefs of both the Government and Santa Fe and Aztec the same figure, to wit, 1,454,087.12 acres is used; Exhibit 24 is attached to the stipulation, and the stipulation is a part of the record and the Joint Appendix in the case. Exhibit 24 is at page 204A of the Joint Appendix.

While the stipulation did not, in terms, refer to the dates of completion of surveys of the lands in suit, it did include, as above appears, a reference to the administrative findings of the Undersecretary of the Interior of July 16, 1947. Those findings and an appendix thereto are in the record; the appendix to the findings is at page 204 of the Joint Appendix. The appendix to the administrative findings tabulates the surveys of the lands in suit and the dates thereof as set forth in the margin.7

6. The term "vacant lands" as used in the stipulation means lands not withdrawn and not disposed of to persons other than the railroad, e. g., by virtue of homestead settlement, pre-emption, or other lawful disposition. This should be borne in mind in reading Exhibit 24 and this opinion.

7. 321

APPENDIX "A"

Arizona
Gila and Salt River Meridian

| Township and Range | Section | Official plats of survey | | |
| --- | --- | --- | --- | --- |
| | | Approval DATE | Filing Date | Acres |
| T. 13 N., R. 9 E., | secs. 5, 7, 9 | Feb. 28, 1935 | Nov. 18, 1936 | 1,862.08 |
| T. 14 N., R. 9 E., | secs. 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Feb. 28, 1935 | Nov. 18, 1936 | 10,993.07 |
| T. 14 N., R. 11 E., | secs. 33, E½; 35, SW¼ | (unsurveyed) | | 480.00 |
| T. 13 N., R. 12 E., | secs. 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 9, 1895 | Nov. 10, 1896 | 11,802.56 |

Note 7 continued on page 514.

The stipulation of facts included also facts relevant to the issue raised by the Government's denial of the allegation of the complaint that Aztec was a bona fide purchaser for value of the lands in suit. I do not state those facts because in the view I take herein the decision in the district court on that issue need not be considered.

The case was submitted to the district court on the facts agreed upon. The court made findings of fact and conclusions of law. On the issue as to a deficiency in indemnity lands to make up place land losses in the Atlantic and Pacific grant the court found, in substantially the words of the complaint, that:

"Prior to and at the time of the said withdrawal, [of August 17, 1898, of the lands in suit for forest reserve purposes] and at all times thereafter to and including 1940, the unsatisfied losses in the place limits of the grant exceeded the surveyed lands within the indemnity limits of the grant available for selection, and to that extent there was and has been a deficiency in the grant since some time prior to August 17, 1898, of not less than 100,000 acres."

The court made conclusions of law which, so far as here pertinent, were as follows:

"That the withdrawal of August 17, 1898, was void in view of the deficiency in the grant found in . . . the Findings of Fact, and that at the time of the filing by Santa Fe Pacific of the release of further claims to lands granted in aid of the construction of its railroad, pursuant to Section 321(b) of the Transportation Act of 1940, Santa Fe Pacific had a right to select the lands in question in the interest of its purchaser Aztec. . . .

"That the right of Santa Fe Pacific to select the said lands and to apply for the issuance of a patent thereto in the interest of Aztec is not barred by the said release."

The court made no findings of fact or conclusions of law in respect of the issue of estoppel, but that such an issue was involved in the decision of the case is evidenced by the opinion of the court referred to in topic IV of this opinion.

The district court then entered judgment for Sante Fe and Aztec in substance

| | | | |
|---|---|---|---|
| T. 14 N., R. 12 E., secs. 3, 5, 7, 9, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 9, 1895 | Mar. 30, 1896 | 10,134.32 |
| T. 15 N., R. 12 E., secs. 31, 33 | Oct. 9, 1895 | Mar. 30, 1896 | 1,458.80 |
| T. 13 N., R. 13 E., secs. 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 9, 1895 | Mar. 30, 1896 | 11,849.78 |
| T. 14 N., R. 13 E., secs. 19, 21, 29, 31, 33 | Oct. 9, 1895 | Mar. 30, 1896 | 3,439.44 |
| T. 13 N., R. 14 E., secs. 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 9, 1895 | Jan. 20, 1896 | 5,736.51 |
| T. 13 N., R. 15 E., Secs. 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 9, 1895 | Jan. 20, 1896 | 5,717.59 |
| T. 12 N., R. 16 E., secs. 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 2, 1937 | Oct. 14, 1939 | 9,256.84 |
| T. 12 N., R. 17 E., secs. 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Oct. 2, 1937 | Oct. 14, 1939 | 8,465.20 |
| T. 10, N., R. 20 E., secs. 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23 | Sept. 19, 1917 | Nov. 4, 1918 | 7,469.47 |
| T. 11 N., R. 21 E., secs. 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35 | Nov. 15, 1921 | June 12, 1922 | 10,025.89 |

322

as prayed for in the complaint. This appeal was then taken.

I have described at length the manner in which this case arose, the nature of the first trial and decision in the district court, the first appeal and decision in this court, and the second proceeding and decision in the district court because I think such description necessary to make clear just what questions should be considered on this appeal. In the view I take they reduce themselves to but two, the question as to whether or not there was a deficiency at all times since prior to August 17, 1898, of not less than 100,000 acres in indemnity lands available to fill up place land losses in the Atlantic and Pacific grant, and the question of estoppel.

III

Was the district court's finding as to a deficiency correct? As said in their brief, the "appellees' case must stand or fall on the allegation of their complaint . . . and on the finding of the District Court . . . that, since sometime prior to the date of the 1898 withdrawal there has been a deficiency in the Atlantic & Pacific grant of not less than 100,000 acres." The question as to the correctness of the district court's finding must be answered in view of the rulings, reviewed in topic I of this opinion, of the Supreme Court in the Forest Reserve case of 1921 and the Northern Pacific case of 1940—the ruling, that is to say, that where the withdrawal of indemnity lands leaves a deficiency to satisfy place land losses the withdrawal is void and the railroad may have recourse to the lands within the withdrawn area, and the ruling that in ascertaining the amount of available land within the indemnity limits to satisfy place land losses only surveyed lands are to be considered. The question as to the existence of a deficiency is, therefore, to be answered by comparing the current indemnity claim of the railroad—that is, its unsatisfied place land losses at a given time —with the current surveyed acreage in the unwithdrawn and, if necessary, the withdrawn indemnity areas. In the light of the foregoing the figures accredited by the stipulation, the briefs and Exhibit 24 as correct make clear that there was no deficiency in surveyed lands after December 31, 1924. The figures show the following: The original indemnity claim of Santa Fe, i. e., the total place land losses, was for 1,454,087.12 acres. By the end of 1924 Sante Fe had already selected 989,239.63 acres—other than the lands in suit—in satisfaction of its indemnity claim. That left a net unsatisfied claim of 464,847.49 acres. There were available for satisfaction of the indemnity claim at the end of 1924, 167,632.33 acres of surveyed lands in the unwithdrawn area and 368,419.41 acres of surveyed lands in the withdrawn area, a total of 536,051.74 acres. Thus, at the end of 1924, there was an excess of surveyed indemnity lands over the indemnity claim for place land losses of 71,204.25 acres. It is proper to count the surveyed lands in the withdrawn area because the surveyed lands in the unwithdrawn area, 167,632.33 acres, were less than the unsatisfied indemnity claim of 464,847.49. The figures show for 1925 an excess of 99,637.-04 acres; for 1926, 157,745.23 acres; for 1927, 158,967.48 acres; for 1928, 163,162.45 acres; for 1929, 161,524.95 acres; for 1930, 173,615.39 acres; for 1931, 171,750.03 acres; for 1932, 203,034.81 acres; for 1933, 206,633.12 acres; for 1934, 213,245.17 acres; for 1935, 213,893.53 acres; for 1936, 257,692.87 acres; for 1937, 274,533.66 acres; for 1938, 275,013.66 acres; for 1939, 352,061.26 acres; for 1940, 367,089.83 acres. In each of the years 1925 to 1940, inclusive, it is proper to count the surveyed lands in the withdrawn area because the surveyed lands in the unwithdrawn area were less than the unsatisfied indemnity claim. I set forth in the margin a table, based on Exhibit 24 and upon the accepted

figure of 1,454,087.12 acres of total place land losses, showing the process by which the foregoing figures are reached.[8]

Thus the figures establish that since 1924 there has been no deficiency, but on the contrary an excess, of indemnity lands to satisfy place land losses under Santa Fe's claim if the rulings of the Supreme Court in the Forest Reserve case and Northern Pacific case requiring consideration of both unwithdrawn and, if required, withdrawn surveyed lands are respected. It follows that the decision of the district court on the deficiency issue in favor of Santa Fe and Aztec was, as a matter of law, not correct. It follows from this that the judgment in favor of Santa Fe and Aztec was erroneous—for since there was an excess after 1924 of indemnity lands to satisfy place land losses, selection by Santa Fe of the specific indemnity lands in suit was necessary for acquisition of a right thereto; and it is without dispute that Santa Fe did not attempt to select the lands (save in the abortive attempt of 1887 when the lands were still unsurveyed)

until after the execution of the release. Santa Fe itself, therefore, acquired no interest, either equitable or legal, in the lands in suit. Hence, those lands were not the subject of the contract of sale with or deeds to Aztec, i. e., had not prior to September 18, 1940 been sold to Aztec, and were therefore not within the saving clause of Section 321(b) of the Transportation Act of that date. Since Santa Fe acquired nothing which it could convey to Aztec, the issue whether Aztec was a bona fide purchaser for value of the lands in suit is immaterial and need not be considered. The district court's decision is not in accord with the law of the case as laid down by this court in the opinion of Judge Groner described in topic II of this opinion. The court remanded the case solely for a determination of the question whether or not in the light of the Forest Reserve and Northern Pacific decisions there was at all times since prior to August 17, 1898 a deficiency of indemnity lands to satisfy place land losses. The opinion made clear that if no such deficiency was found the Government was to

| [8] 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|
| Year | Total place land losses | Total area selected | Total unsatis-fied place land losses | Surveyed unwith-drawn (vacant) lands | Surveyed withdrawn lands | Total available surveyed lands | Excess of available surveyed lands over unsatis-fied place land losses |
| 1924 | 1,454,087.12 | 989,239.63 | 464,847.49 | 167,632.33 | 368,419.41 | 536,051.74 | 71,204.25 |
| 1925 | 1,454,087.12 | 989,239.63 | 464,847.49 | 195,985.12 | 368,499.41 | 564,484.53 | 99,637.04 |
| 1926 | 1,454,087.12 | 989,239.63 | 464,847.49 | 233,027.72 | 389,565.00 | 622,592.72 | 157,745.23 |
| 1927 | 1,454,087.12 | 1,001,090.00 | 452,997.12 | 213,793.35 | 398,171.25 | 611,964.60 | 158,967.48 |
| 1928 | 1,454,087.12 | 1,015,090.08 | 438,997.04 | 202,588.24 | 399,571.25 | 602,159.49 | 163,162.45 |
| 1929 | 1,454,087.12 | 1,050,009.94 | 404,077.18 | 165,740.88 | 399,861.25 | 565,602.13 | 161,524.95 |
| 1930 | 1,454,087.12 | 1,051,925.40 | 402,161.72 | 164,465.42 | 411,311.69 | 575,777.11 | 173,615.39 |
| 1931 | 1,454,087.12 | 1,052,005.40 | 402,081.72 | 160,937.58 | 412,894.17 | 573,831.75 | 171,750.03 |
| 1932 | 1,454,087.12 | 1,068,896.92 | 385,190.20 | 165,484.84 | 422,740.17 | 588,225.01 | 203,034.81 |
| 1933 | 1,454,087.12 | 1,068,896.92 | 385,190.20 | 143,469.73 | 448,353.59 | 591,823.32 | 206,633.12 |
| 1934 | 1,454,087.12 | 1,068,896.92 | 385,190.20 | 143,156.02 | 455,279.35 | 598,435.37 | 213,245.17 |
| 1935 | 1,454,087.12 | 1,068,896.92 | 385,190.20 | 143,373.14 | 455,710.59 | 599,083.73 | 213,893.53 |
| 1936 | 1,454,087.12 | 1,068,896.92 | 385,190.20 | 149,076.98 | 493,806.09 | 642,883.07 | 257,692.87 |
| 1937 | 1,454,087.12 | 1,074,813.95 | 379,273.17 | 148,356.98 | 505,449.85 | 653,806.83 | 274,533.66 |
| 1938 | 1,454,087.12 | 1,074,813.95 | 379,273.17 | 148,836.98 | 505,449.85 | 654,286.83 | 275,013.66 |
| 1939 | 1,454,087.12 | 1,074,813.95 | 379,273.17 | 162,864.26 | 568,470.17 | 731,334.43 | 352,061.26 |
| 1940 | 1,454,087.12 | 1,074,813.95 | 379,273.17 | 177,892.83 | 568,470.17 | 746,363.00 | 367,089.83 |

The figures in column 1 denote the end of each of the years mentioned.

The figures in columns 2, 3, 4, 5, 6, 7, and 8 designate acres.

The figures in column 4 denote the difference between those in columns 2 and 3.

The figures in column 7 denote the sum of the figures in columns 5 and 6.

The figures in column 8 denote the difference between the figures in column 7 and in column 4.

prevail; only if there was such a deficiency were Santa Fe and Aztec to prevail.

The conclusion of law of the district court that the "right of Santa Fe Pacific to select" the lands in suit and the right of Santa Fe "to apply for the issuance of a patent thereto in the interest of Aztec is not barred by the said release" of December 18, 1940, is without foundation in law. For, as appears above, the saving clause in Section 321(b) of the Transportation Act of September 18, 1940, covers, so far as here pertinent, only "such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value." Santa Fe, as said above, could not sell to Aztec lands to which Santa Fe had not acquired title. The saving clause of Section 321(b) contains nothing that excepts from a release a "right to select" lands or a right "to apply for the issuance of a patent" to lands not selected. Moreover, the release, pursuant to the requirements of Section 321(b), released "any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interests granted, claimed to have been granted, or [sic] claimed should have been granted by any act of the Congress to Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad." That language is so broad as to release to the Government anything in the nature of a "right to select" lands or a right "to apply for the issuance of a patent" for lands not selected. Santa Fe filed with the Secretary of the Interior at the time the release was filed merely a "list of all innocent purchasers for value to whom said Santa Fe Pacific Railroad Company or its predecessor, Atlantic and Pacific Railroad Company, had sold any of the unpatented lands within the limits of its grant prior to September 18, 1940, with a description of the lands so sold, the said list including the name of the Aztec Land and Cattle Company and a description of the lands sold to that com-

pany as stated" in the complaint. Santa Fe did not include, and could not lawfully have included, within that list the name of Aztec as a purchaser of a "right to select" or of a right "to apply for the issuance of a patent" to lands not selected. The attempted selection of June 26, 1942, by Santa Fe in the interest of Aztec was legally ineffective—since a right to select was not within the saving clause of Section 321(b). The attempted selection of 1887 was also legally ineffective because it is without dispute that the lands in suit were at that time not surveyed; and it was decided by the Supreme Court in the Northern Pacific case of 1940 that no selection can be made of unsurveyed lands because, until surveyed, they are not public lands.

Santa Fe and Aztec attempt to support their contention that there has been a deficiency of indemnity lands to satisfy place land losses since 1924 by comparing the current indemnity claim commencing with the end of 1924 with the current *surveyed* acreage in *unwithdrawn* lands, that is to say, leaving out of account the surveyed lands in the withdrawn area.[9] But the method is untenable because it fails to give effect to the rulings in the Forest Reserve case and the Northern Pacific case of 1940 to the effect that where the surveyed lands in the unwithdrawn indemnity area are insufficient to satisfy place land losses recourse may be had to the surveyed lands in the withdrawn area.

It is to be noted further that while the district court's conclusion of law that the withdrawal of August 17, 1898 was void is correct that is so for the reason that if only the surveyed lands in the unwithdrawn indemnity area are counted they do not total at any time after the withdrawal a sufficient amount to make up the place land losses. But it follows from this, under the ruling in the Forest Reserve case, that recourse to the withdrawn lands was permissible as against the Government; and, as is demonstrated above, once recourse to the surveyed withdrawn lands is made and the acreage thereof added to the

9.  The method is merely that of comparing the figures in column 4 of footnote 8 with the figures in column 5.

surveyed acreage in the unwithdrawn indemnity area there is no deficiency, but on the contrary an excess, after the end of 1924, of indemnity lands to make up place land losses.

## IV

But Santa Fe and Aztec urge that the foregoing method (described in topic III) of counting available indemnity lands is, because of previous inconsistent positions taken by it, not open to the Government. Santa Fe and Aztec argue that surveyed withdrawn lands cannot properly be counted in computing the available indemnity lands because prior to the decision in the Forest Reserve case in 1921 the Government had "maintained for decades that withdrawn land was unavailable for selection, and regularly rejected selections on the ground that the selected lands had been properly withdrawn . . .." Santa Fe and Aztec contend further that the decision in the Forest Reserve case was itself "not given its full effect by the Land Department because of the Secretary's position that, in ascertaining whether a deficiency existed, he could take into account *unsurveyed* indemnity lands as well as surveyed indemnity lands . . .." In this respect Santa Fe and Aztec refer to the rulings of the

Commissioner of the General Land Office of November 30, 1931, and March 22, 1932, which are described in topic II of this opinion as facts agreed upon relevant to an issue of estoppel. In the position taken in those rulings—Santa Fe and Aztec assert—the Secretary of the Interior was not overruled until the second Northern Pacific case in 1940, wherein the Supreme Court held that only *surveyed* lands could be considered as available in determining whether and to what extent a deficiency existed at any stated time. "Thus," say Santa Fe and Aztec, "it was not until 1940 that the present appellees were in a position successfully to claim the lands here involved on the ground of the invalidity of the 1898 withdrawal." To permit the Government now to rely upon the position, in counting available indemnity lands, that "because the courts at long last held that a withdrawal which creates a deficiency is invalid, therefore the withdrawals must be disregarded in determining whether there ever was a deficiency" would be—so Santa Fe and Aztec urge—"to permit the present Secretary [of the Interior] to take advantage of his predecessors' wrongs." The district court in its decision, as explained in its opinion, was apparently moved by similar considerations.[10] The contentions of Santa Fe and Aztec thus

10. The opinion of the district court was oral, but was reported and is printed in the record. The language suggesting an estoppel is as follows:

"... The Government further claims that nothing remained due under the original grant to the Atlantic & Pacific Railroad Company. The contention, however, is in turn based on the proposition that since the action of the United States in withdrawing the lands for forest reserves in 1898 must be deemed to have been ineffective by reason of the ruling of the Supreme Court in 1921, the Railroad company could have had previously selected these lands, and has lost its right to do so by the 1940 release.

"The Government, however, had withdrawn the land in 1898 and contended that it had a right to do so. It declined to accept any claims for selections of lands which had been put into the forest reserve. It was not until 1921 that the Supreme Court rendered a ruling that the Government's position was erroneous.

"Surely, under those circumstances the

United States may not charge the railroad company with the gift of prophesy and assert that the railroad company should have ignored the action of the Government and should have insisted on selecting these lands prior to 1921. To permit such a result would be to allow the Government to take advantage of its own action which later—many years later —was held by the Supreme Court to be erroneous and illegal."

Santa Fe's and Aztec's contention on appeal on this subject is phrased as follows:

"If appellants were correct in their present contention that lands withdrawn under a claim of right and as to which selection was regularly denied are now to be regarded as available, after the courts have ruled that selection is not necessary for identification in such circumstances, then the adjustment of railroad land grants will have been turned into a species of shell game, an absorbing kind of legal legerdemain where the same question receives different answers

outlined and the decision of the district court in this particular are, in effect, the raising of an estoppel against the Government.

There is no finding of fact by the district court in respect of the asserted regular rejection of selections on the ground that the selected lands had been properly withdrawn, and there is no finding of fact in respect of reliance by Santa Fe upon the administrative rulings with reference to unsurveyed lands. But even if such regular rejection of selections and such reliance be assumed, there is, in my view, no force in the estoppel contentions of Santa Fe and Aztec.

It is settled law that no estoppel can arise against the Government in the exercise of a public or governmental function as distinguished from a proprietary one. Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; cf. Sanitary District v. United States, 1925, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352; 54 Am.Jur., United States, § 124, pp. 631–2. The authorities indicate also that the holding and disposition of public lands is a governmental function. Van Brocklin v. State of Tennessee, 1886, 117 U.S. 151, 6 S.Ct. 670, 29 L.Ed. 845; City of Springfield v. United States, 1 Cir., 1938, 99 F.2d 860. In the latter case the United States brought suit against the City of Springfield to enjoin it from selling for taxes certain property which the United States had used as a post office site, had then leased to private parties pending its sale, and had then contracted to sell. An applicable Massachusetts statute exempted from taxation property owned by the United States and used by it for essential governmental functions. In ruling in favor of the United States, the Court of Appeals for the First Circuit said:

"The right to dispose of property by the United States which is no longer needed, is an essential governmental function in the economic management of governmental affairs, and is recognized by Sec. 3, Cl. 2 of Art. 4 of the Constitution . . . and while the government is seeking a purchaser, the leasing of such property conditioned on a thirty days' notice to terminate such lease in case a purchaser is found cannot have the effect of subjecting such property to taxation by the municipality in which it is situated . . ." [99 F.2d at page 863]

In the Van Brocklin case the Supreme Court said:

"The United States do not and cannot hold property, as a monarch may, for private or personal purposes. All the property and revenues of the United States must be held and applied . . . 'to pay the debts and provide for the common defence and general welfare of the United States.'" [117 U.S. at pages 158–159, 6 S.Ct. at page 674]

If the disposition of public lands generally is the exercise of a governmental function, a fortiori the disposition of such lands to promote, in the public interest, the development of railroads is the exercise of a governmental function.

But even if it be assumed, arguendo, that such disposition of public lands is the exercise of a proprietary function so that an estoppel would not be inapplicable as against the Government, nevertheless the fact that the Government has taken inconsistent positions before and after 1921 as to the counting of withdrawn lands, and before and after 1940 as to the counting of unsurveyed lands, in estimating the amount of indemnity land available to fill up place land losses, and, therefore, as to the right of Santa Fe to have recourse to the withdrawn area in order to select the lands in suit, does not constitute a proper basis for an estoppel. It is elementary that an expression of opinion upon a question of law does not constitute a foundation for estoppel; there must be a representation of fact. C. I. T. Corporation v. Carl, D.C.Cir. 1936, 85 F.2d 809. The position of the Government expressed in the decisions of the Commissioner of the General Land Office in 1931 and 1932 that under the land grant statutes unsurveyed lands are to be

as land which is withheld as unavailable at one juncture is put forward as available at another. The only consistency in the Department's position is that, in each instance, the railroad, like the countryman at the carnival, always loses."

Neither the district court in its opinion nor Santa Fe and Aztec in their brief on this appeal, nor the Government in its brief aid the court by the citation of authorities in respect of the estoppel question.

counted in estimating the indemnity lands available to fill up place land losses, and the position of the Government prior to the decision in the Forest Reserve case that withdrawals for forest reserve purposes in the face of a deficiency are lawful, were but the expressions by officials of the Government of opinions on questions of law, to wit, the effect of the land grant statutes. To the ruling that an expression of an opinion upon a question of law does not constitute a basis for estoppel, there is one exception, to wit, that inconsistent positions on a question of law cannot be taken in judicial proceedings to which the one asserting an estoppel is a party. Davis v. Wakelee, 1895, 156 U.S. 680, 15 S.Ct. 555, 39 L.Ed. 578.[11] But that exception is of no force in the instant case because the position of the Department of the Interior in respect of the counting of unsurveyed lands was not a position taken in a judicial proceeding; it was an administrative ruling of the Department itself. And although the Government contended in the Forest Reserve case that withdrawals, for forest reserve purposes, of indemnity lands in the face of a deficiency are lawful, neither Santa Fe nor Aztec was a party to that action, and Santa Fe's predecessor, Atlantic and Pacific, was not.

In U. S. v. City and County of San Fran-cisco, 1940, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050, an attempt was made, as in the instant case, to bind the Government to administrative rulings in conflict with its contentions in the case before the Court. The Supreme Court held that this could not be done. In that case, the (Raker) Act of December 19, 1913, 38 Stat. 242, granted to the City and County of San Francisco certain lands and rights-of-way in the public domain. The Act declared that the grant—known as the "Hetch-Hetchy" grant —was intended for use by the city both in constructing and maintaining a means of supplying water for the domestic purposes of the city and other public bodies, and in establishing a system " 'for generation and sale and distribution of electric energy.' " Section 6 of the Act provided:

"That the grantee [the city] is prohibited from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it or him by the said grantee: *Provided,* That the rights hereby granted shall not be sold, assigned, or transferred to any private person, corporation, or association, and in case of any attempt to so sell, assign, transfer, or convey, this grant shall revert to the Government of the United States."

Upon application of the Secretary of the Interior, the Government commenced an action in equity charging the city with disposing of power through the Pacific Gas

---

11. In Davis v. Wakelee, Wakelee held promissory notes of Davis. Davis had been adjudged a bankrupt, but the bankruptcy court had granted Wakelee leave to bring action on the notes independently of the bankruptcy proceedings. Wakelee brought suit and secured a judgment upon the notes. Subsequently Davis filed a petition for discharge in bankruptcy. An opposition thereto was filed by Wakelee and thereupon Davis moved to dismiss the opposition upon the ground that the bankruptcy court had given Wakelee leave to procure judgment on the notes and that Wakelee had secured a *valid* judgment unaffected by the bankruptcy proceedings. Wakelee accepted this contention as meritorious and, therefore, did not protest when his opposition to the petition of Davis for discharge in bankruptcy was dismissed. But Wakelee brought an action on the judgment which he had secured on the notes and in that action Davis attempted to assert that the judgment on the notes was *void* for lack of jurisdiction in the court entering it. Wakelee then filed a bill in equity to enforce an estoppel preventing Davis from attacking the validity of the judgment on the notes. The Supreme Court held that Davis was estopped because of the inconsistent position he had taken in the proceedings relating to his petition for a discharge in bankruptcy with regard to the judgment on the notes, i. e., as above said, he had there contended that it was a *valid* judgment. The Supreme Court said, quoting Railway Company v. McCarthy, 96 U.S. 258, 267, 24 L.Ed. 693: " 'Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after the litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold.' " [156 U.S. 690–691, 15 S.Ct. 558–559]

& Electric Company, a private utility, in violation of Section 6. The city contended that that section did no more than prohibit the city from selling Hetch-Hetchy power to a private utility for resale to consumers and, therefore, permitted consignment of power to the company, as agent for the city, for sale and distribution. To the contrary, the Government argued that Section 6 not only withheld the right to sell the power for resale, but also prohibited the city "from ever selling or letting" to any private corporation "the right to sell or sublet . . . the electric energy sold or given to it . . ." by the city. The Supreme Court upheld the Government's construction of Section 6 and ruled that the arrangement for disposition of the power through the company was a violation of that section. Among the contentions made by the city was one to the effect that the Department of the Interior had, over a long period, construed Section 6 consistently with the construction relied upon by the city and that conduct, of which the Department's interpretations of Section 6 were a part, estopped the Government from taking a contrary position in the suit. That, in effect, is the contention of Santa Fe and Aztec in that aspect of the instant case under present discussion. The Supreme Court ruled:

"A substantial part of the City's argument rests upon its claim that the Department of the Interior in the period from 1913 to 1937 construed § 6 to forbid no more than sale of power for resale. We are asked to accept these administrative interpretations. And in addition the City suggests that conduct of the Department, of which these interpretations were a part, is sufficient to create an estoppel against the Government. Whether the Department at any time ever did more than merely to tolerate sale and distribution of Hetch-Hetchy power by the Company as a temporary expedient is doubtful. Certain it is, however, that in 1935 the Secretary of the Interior declared the City's disposition of the power through the Company to be a violation of § 6, demanded discontinuance of this violation without success and thereafter instigated this proceeding. We cannot accept the contention that administrative rulings—such as those here relied on—can thwart the plain purpose of a valid law. As to estoppel, it is enough to repeat that '. . . the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.'" [The Court here cited Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L. Ed. 791, referred to above.] [310 U.S. at pages 31–32, 60 S.Ct. at page 757]

In my view this ruling, and the other considerations and rulings which I state above, make the estoppel contention of Santa Fe and Aztec unsupportable.

I think it proper to point out further that although Santa Fe and Aztec contend that the Government is estopped, they do not consistently rely upon that position. One asserting an estoppel seeks to bind another to a representation upon which the former relied to his detriment. But Santa Fe and Aztec do not consistently urge that the Government should be bound, and that they should be allowed, to continue to count, in determining whether or not at all times since prior to 1898 there has been a deficiency of indemnity lands to satisfy place land losses, both the surveyed and unsurveyed lands in the unwithdrawn indemnity area. They do not consistently so urge for the reason that if both surveyed and unsurveyed lands in the unwithdrawn area were counted, there could be no acquisition of title by Santa Fe to the lands in suit since it would not be necessary to have recourse to the withdrawn area, wherein those lands are located, and hence not proper to do so. This may be demonstrated as of the end of the year 1924, for example, by recourse to Exhibit 24, as follows: The total unsatisfied place land losses—determined by deducting the total area selected by the end of 1924, 989,239.63 acres, from the original indemnity claim of 1,454,087.12 acres—was 464,847.49 acres. Exhibit 24 shows in the unwithdrawn area surveyed lands totaling 167,632.33 acres and unsurveyed lands totaling 444,071.99 acres. The sum of these two figures is 611,704.32 which is in excess of the current indemnity claim of 464,847.49. This same method shows upon the basis of Exhibit 24 an excess as of the end of each year 1872 to 1940, inclusive, of surveyed and unsurveyed lands in the unwithdrawn indemnity area over unsatisfied place land losses and shows, therefore, that at no time under such a method of counting indemnity lands would the withdrawn lands have been needed. What Santa Fe and Aztec really do, and contend

that they have a right to do, to show that there has been a deficiency at all times since prior to 1898, is, as I point out in topic III of this opinion, to count only the surveyed lands in the unwithdrawn indemnity area alone. But, as above demonstrated, that cannot properly be done because under the 1940 decision in the Northern Pacific case it became necessary to count only surveyed lands, and the surveyed lands in the unwithdrawn area alone are not sufficient to satisfy the place land losses; therefore, the surveyed lands in the withdrawn area must be counted and when they are counted there is no deficiency after the end of 1924.

## V

In summary and conclusion: The pertinent rules of law respecting acquisition of indemnity lands under railroad construction grants are, as reflected in the Payne, Forest Reserve, and Northern Pacific cases, these: If there is an excess of indemnity lands over place land losses the railroad, in order that its right to specific indemnity lands shall attach, must identify such lands by selection; if there is a deficiency selection is not necessary—all of the lands are, as between the railroad and the Government, "appropriated" to the former's claim. In ascertaining the amount of available indemnity lands, only surveyed lands are to be counted—unsurveyed lands not being "public land." Recourse, in counting available indemnity lands, is first to be had to unwithdrawn (vacant) areas; but if the lands therein are insufficient to satisfy the place land losses recourse may then be had to withdrawn lands, withdrawals, in the face of a deficiency of indemnity lands to satisfy place land losses, being void. It was under these rules that this case, when previously before this court, was remanded for further proceedings. The remand was made in view of the allegation of the complaint of Santa Fe and Aztec—upon which allegation their case was pitched—that

there had been a deficiency of indemnity lands to fill up place land losses from some time prior to August 17, 1898 and "at all times since" which at no time had been less than 100,000 acres. It was made clear in the remand that if such a deficiency was shown Santa Fe and Aztec were to prevail, but that if such a deficiency was not shown the Government was to have judgment. Counting indemnity lands under the rules stated there was an excess of indemnity lands over place land losses from 1924 to the end of 1940. By the end of 1924, 67,634.36 acres of the lands in suit had been surveyed. By November 18, 1936, 12,855.15 additional acres had been surveyed, and by October 14, 1939 all of the lands in suit except 480 acres (concerning which no contention appears to be made) had been surveyed. When surveyed, the lands became subject to selection. Santa Fe could therefore have commenced filing selections in 1925 and completed the same prior to the enactment of the Transportation Act of September 18, 1940. It did not do so. Hence, it acquired no interest in the lands in suit and therefore there was no sale of lands to Aztec which could be the subject of the saving clause of Section 321 (b) of the Transportation Act of 1940. The Government is not estopped to rely upon the rules of law above reviewed. That Santa Fe and Aztec may have misapprehended those rules as ultimately declared in the decision of the Northern Pacific case of 1940 does not relieve them from the force thereof. Had Santa Fe filed selections as the lands were surveyed and had the Department of the Interior for any reason rejected them, the courts were open then, as they are now, to test the validity of rejections.

I conclude, therefore, that the judgment of the district court in favor of Santa Fe and Aztec is erroneous and should be reversed and that judgment in favor of the Government should be ordered entered.